**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| WASHINGTON BLADE, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 20-2591 (RDM) |
| U.S. DEPARTMENT OF LABOR, | |
| *Defendant*. | |

---

## MEMORANDUM OPINION AND ORDER

Plaintiffs in this case are the Washington Blade, "the oldest LGBTQ newspaper in the United States" "dedicated to covering issues pertaining to the LGBTQ community," and Chris Johnson, a journalist and former chief political and White House reporter for the Washington Blade. *See* Dkt. 31-1 at 9. They bring this suit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to challenge the adequacy of the Department of Labor's ("the Department") response to a FOIA request Plaintiffs made in August 2019. That request, which followed the Department's announcement of a proposed rule expanding the scope of the "Religious Entities Exemption" to Executive Order 11246, sought "all emails" from Department of Labor leadership that "include[d] the words 'religion' or 'religious' from Jan. 20, 2017 to Aug. 30, 2019." Dkt. 30-1 at 1 (Def.'s SUMF ¶ 1); Dkt. 31-2 at 1 (Pls.'s SUMF ¶ 1). Dissatisfied with the Department's response, Plaintiffs filed this suit.

Now pending before the Court are the Department's motion for summary judgment, Dkt. 30, and Plaintiffs' cross-motion for partial summary judgment, Dkt. 31. At issue is the Department's decision to withhold approximately 230 records pursuant to FOIA Exemption 5, which permits a government agency to withhold documents that it would otherwise not be

required to disclose in civil litigation.  For the reasons that follow, the Court **DENIES** in part and **GRANTS** in part the Department's motion for summary judgment and **DENIES** in part and **GRANTS** in part Plaintiffs' cross-motion for summary judgment.

## I. BACKGROUND

### A.    Executive Order 11246 and its Implementing Regulations and Directives

Executive Order 11246, as amended, (the "Executive Order") prohibits federal contractors from discriminating against their employees on the basis of race, color, religion, sex, sexual orientation, gender identity and national origin.  Exec. Order No. 11246, § 202(1).  The Executive Order further mandates that federal contractors "take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin," including through promotions, demotions, layoffs, pay raises and training programs.  *Id.*

The Department of Labor's Office of Federal Contract Compliance Programs ("OFCCP") is responsible for enforcing the Executive Order pursuant to regulations promulgated by the Secretary of Labor.  *See* 41 C.F.R. § 60-1.2.  If OFCCP has "reasonable cause" to believe that a federal contractor has violated the Executive Order, it "may issue a notice requiring the contractor to show cause, within 30 days, why monitoring, enforcement proceedings or other appropriate action to ensure compliance should not be instituted."  *Id.* § 60-1.33.  If the response is unsatisfactory, OFCCP may refer the matter to the Solicitor of Labor "with a recommendation for the institution of administrative enforcement proceedings," *id.* § 60-1.26(b)(1), or to the Department of Justice ("DOJ") "with a recommendation for the institution of judicial enforcement proceedings," *id.* § 60-1.26(c)(1).

The Executive Order does not, however, apply to every federal contractor; as relevant here, certain religious entities are exempt from some of its requirements (the "Religious Entities Exemption"). Section 204 of the Executive Order provides that its requirements "shall not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." Exec. Order No. 11246, § 204(c); *see also* 41 CFR § 60-1.5(a)(5). The Executive Order further clarifies, however, that "[s]uch [religious] contractors and subcontractors are not exempted or excused from complying with the other requirements contained in this Order." Exec. Order No. 11246, § 204(c); 41 CFR § 60-1.5(a)(5).

From 2003 (shortly after President Bush amended the Executive Order to include the Religious Entity Exemption) until 2019 (when the events relevant to this case occurred), the Religious Entities Exemption was understood to mirror the religious entity exemption in Title VII of the Civil Rights Act of 1964. To determine the scope and applicability of the exemption, OFCCP would apply Title VII case law and principles to the facts and circumstances of each contractor's situation. *See* Rescission of Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption Rule ("2023 Final Rule"), 88 Fed. Reg. 12842-01 (effective March 31, 2023).

That changed on August 15, 2019, when OFCCP issued a notice of proposed rulemaking, which proposed to expand the Religious Entity Exemption in light of "recent legal developments." Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption ("2020 Final Rule"), 85 Fed. Reg. 79324-01 (Dec. 9, 2020). Pointing to several recent Supreme Court decisions, *see, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil*

*Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018); *Trinity Lutheran Church of Columbia, Inc. v.*

*Comer*, 582 U.S. 449, 462 (2017); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 718–19

(2014); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 196

(2012), the proposed rule sought "to make clear that:"

> [T]he Executive Order 11246 religious exemption covers not just churches but employers that are organized for a religious purpose, hold themselves out to the public as carrying out a religious purpose, and engage in exercise of religion consistent with, and in furtherance of, a religious purpose. It is also intended to make clear that religious employers can condition employment on acceptance of or adherence to religious tenets without sanction by the federal government, provided that they do not discriminate based on other protected bases. In addition, consistent with the administration policy to enforce federal law's robust protections for religious freedom, the proposed rule state[d] that it should be construed to provide the broadest protection of religious exercise permitted by the Constitution and other laws.

Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious

Exemption ("2019 Proposed Rule"), 84 Fed. Reg. 41677-79 (proposed Aug. 15, 2019).

Following notice and comment, the proposed rule was finalized in December 2020, and it took

effect on January 8, 2021. *See* 2020 Final Rule, 85 Fed. Reg. 79324-01. More recently,

however, the revised rule was rescinded, and the Department of Labor returned to its original

understanding of the Executive Order. *See* Proposal to Rescind Implementing Legal

Requirements Regarding the Equal Opportunity Clause's Religious Exemption, 86 Fed. Reg.

62115-01 (proposed Nov. 9, 2021); 2023 Final Rule, 88 Fed. Reg. 12842-01.

     In the year leading up to OFCCP's publication of the 2019 Proposed Rule, OFCCP also

issued a policy directive pertaining to "religious freedom" ("Religious Entities Exemption

Directive"). Directives, generally, "provide guidance to OFCCP staff and/or federal contractors

on enforcement and compliance policy or procedures." Department of Labor, OFCCP, *Directive*

*(DIR) 2022-02* (effective March 31, 2022), https://www.dol.gov/agencies/ofccp/directives/2022-

02#:~:text=A%20Directive%20(DIR)%20is%20intended,legally%20enforceable%20rights%20o
r%20obligations (last accessed October 17, 2024). But they "do[] not change the laws and/or

regulations governing OFCCP's programs and do[] not establish any legally enforceable rights or

obligations." *Id.* On August 10, 2018, OFCCP released its Religious Entities Exemption

Directive, where it:

> instruct[ed] OFCCP staff—in all their activities—to take into account recent
> U.S. Supreme Court decisions and White House Executive Orders that protect
> religious freedom. The Supreme Court issued rulings in 2014, 2017, and 2018
> that safeguard the broad freedoms and anti-discrimination protections that must
> be afforded religion-exercising organizations and individuals under the U.S.
> Constitution and federal law. Additionally, President Donald J. Trump has
> issued Executive Orders making clear the Administration's commitment to
> robust protections for religious freedom, as well as ensuring a level playing field
> for faith-based organizations to compete for federal grants, contracts, programs,
> and other funding opportunities.

U.S. Department of Labor, *U.S. Department of Labor Announces New Policies to Ensure Equal*

*Employment Opportunity and Religious Freedom*, Press Release (Aug. 10, 2018). Like the

revised rule, the Religious Exemption Directive has been rescinded. *See* Department of Labor,

OFCCP, *Notice of Rescission of Directive 2018-03*, (effective March 1, 2023),

https://www.dol.gov/agencies/ofccp/recission-notices/dir2018-03 (last accessed October 17,

2024).

## B.     Procedural Background

On August 29, 2019, following the announcement of the 2019 Proposed Rule, Plaintiffs

submitted a FOIA request to OFCCP for "all emails to and from the person in the roles of

director, deputy director and director of policy including the words 'religion' or 'religious' from

Jan. 20, 2017 to Aug. 30, 2019." Dkt. 30-1 at 1 (Def.'s SUMF ¶ 1); Dkt. 31-2 at 1 (Pls.'s SUMF

¶ 1). On November 7, 2019, Plaintiffs agreed to limit their request to seek only responsive

material found in the body of emails and not attachments. *See* Dkt. 6 at 4 (Answer ¶ 13).

On May 4, 2020, Plaintiffs filed an administrative appeal with respect to their FOIA request, asserting that the Department had failed to timely respond to their request. *See* Dkt. 1 at 3 (Compl. ¶ 16); Dkt. 6 at 4 (Answer ¶ 16). The Department acknowledged receipt of the appeal in a letter dated May 14, 2020, but did not resolve the appeal prior to the Plaintiffs filing this suit on September 15, 2020. *See* Dkt. 1 at 4 (Compl. ¶¶ 17-19); Dkt. 6 at 5 (Answer ¶¶ 17-19).

After Plaintiffs brought suit, the Department released fourteen tranches of records between December 10, 2020 to June 15, 2022. *See* Dkt. 36-1 at 1 (Def.'s Resp. to Pls.'s SUMF ¶ 19). After meeting to confer on several occasions and the Department's preparation of a *Vaughn* index, the parties resolved all their disputes except those concerning the records the Department withheld pursuant to FOIA's Exemption 5. *See* Dkt. 30-3 at 1-2 (Bickerstaffe Decl. ¶¶ 2-3). Now before the Court are the parties' cross-motions for summary judgment, *see* Dkt. 30, 31, in which Plaintiffs challenge the Department's withholding of all or portions of 231 records pursuant to Exemption 5. *See* Dkt. 31-1 at 8.

## II.  LEGAL STANDARD

"The Freedom of Information Act supports a fundamental pillar of free societies: transparency in government." *Protect Democracy Project, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 569 F. Supp. 3d 25, 34 (D.D.C. 2021). Consistent with this purpose, "FOIA . . . mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). "These exemptions are 'explicitly made exclusive' and must be 'narrowly construed.'" *Id.* (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973), then *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).

Ordinarily, FOIA cases are resolved on motions for summary judgment under Federal Rule of Civil Procedure 56. *See Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175

(D.D.C. 2011).  Under that rule, a court may grant summary judgment if there is no "genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56.  In a FOIA case, "[t]he burden is on the agency to justify withholding the

requested documents."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522

(D.C. Cir. 2015).  Agencies may satisfy that burden by providing affidavits or declarations that

"describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the

information withheld logically falls within the claimed exemption, and are not controverted by

either contrary evidence in the record nor by evidence of agency bad faith."  *Larson v. Dep't of

State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir.

1984)).  Courts do not afford agencies any particular deference in their determinations that their

withholdings were justified; rather the review is de novo.  *See Ctr. for Nat'l Sec. Studies v. Dep't

of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003); 5 U.S.C. § 552(a)(4)(B).  Once an agency has met

its burden, however, the plaintiff "must come forward with 'specific facts' demonstrating that

there is a genuine issue with respect to whether the agency has improperly withheld extant

agency records" if they are to successfully challenge an agency's showing that it complied with

the FOIA.  *Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *U.S.

Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

### III.  ANALYSIS

The parties have resolved their disagreements in all respects relevant here except for the

Department's application of FOIA's Exemption 5 to a large number of records.  That exemption

permits an agency to withhold or to redact "inter-agency or intra-agency memorandums or letters

that would not be available by law to a party other than an agency in litigation with the agency,"

5 U.S.C. § 552(b)(5), which courts have interpreted to encompass the privileges available to the

government in civil litigation, *see U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 263, 272–73 (2021).  Those privileges include the attorney-client and the deliberative process privileges, both of which the Department invokes here.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980) (citations omitted).  But demonstrating that a privilege applies to a particular record is not sufficient to support the withholding of documents under FOIA's Exemption 5.  In addition, an agency may withhold a record under Exemption 5 "only if the agency reasonably foresees that disclosure would harm an interest protected by [the] exemption . . .  or if disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A).

In challenging the Department's withholdings under Exemption 5, Plaintiffs maintain both that the Department is wrong that the asserted privileges apply to certain records and that the Department has not adequately "articulate[d] both the nature of the harm [from release] and the link between the specified harm and the specified information contained in the material withheld."  *See Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quotation omitted).  The Court first considers Plaintiffs' challenges to the Department's withholdings before turning to the foreseeable-harm requirement.

A.     **Deliberative Process Privilege**

"To protect agencies from being 'forced to operate in a fishbowl,' the deliberative process privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Sierra Club*, 592 U.S. at 266 (first quoting *EPA v. Mink*, 410 U.S. 73, 87 (1973), then *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).  The privilege is rooted in "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front[-]page news."  *Dep't*

*of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001).  Accordingly, agencies need not disclose documents if the release of those documents would "chill[]" agency deliberations and impair effective decision-making.  *Sierra Club*, 592 U.S. at 268.

But the deliberative process privilege is not all encompassing:  It applies only to records that are both predecisional and deliberative, although "[i]n practice, these requirements 'tend to merge.'"  *100Reporters v. U.S. Dep't of State*, 602 F. Supp. 3d 41, 60 (D.D.C. 2022) (quoting *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991)).  "Documents are 'predecisional' if they are 'generated before the adoption of an agency policy,' and 'deliberative' if they 'reflect[ ] the give-and-take of the consultative process.'"  *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (second alteration in original) (quoting *Public Citizen, Inc. v. Office of Management and Budget*, 598 F.3d 865, 874 (D.C. Cir. 2010)).  "When invoking the privilege, therefore, an 'agency must establish what deliberative process is involved, and the role played by the documents in issue in the course of that process.'"  *100Reporters*, 602 F. Supp. 3d at 60 (quoting *Senate of P.R. ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987)).  The agency must also explain "the nature of the decision[-]making authority vested in the office or person issuing the disputed document(s), and the positions in the chain of command of the parties to the documents."  *Arthur Andersen & Co. v. I.R.S*, 679 F.2d 254, 258 (D.C. Cir. 1982) (quotation marks and citations omitted).  In other words, to determine if the agency has met its burden of demonstrating that it appropriately applied the privilege, a court must "ask[] whether the agency has offered evidence sufficient to establish the ''who,' *i.e.*, the roles of the document drafters and recipients and their places in the chain of command; the 'what,' *i.e.*, the nature of the withheld content; the 'where,' *i.e.*, the stage within the broader deliberative process in which the withheld material operates;

and the 'how,' *i.e.*, the way in which the withheld material facilitated agency deliberation." *Mountgordon v. United States Coast Guard*, 691 F. Supp. 3d 72, 83 (D.D.C. 2023) (quoting *Judicial Watch, Inc. v. Dep't of Justice*, 20 F.4th 49, 56 (D.C. Cir. 2021)).

    Plaintiffs contend that the Department has failed to meet its burden of showing that many of the documents at issue are predecisional or deliberative in nature. In addressing these arguments, the Court will group the challenged records by subject matter, starting with those records pertaining to congressional inquiries, before turning to records discussing press inquiries, records discussing non-profit inquiries, records containing purportedly "secret law," and all other challenged materials.

    1.    *Congressional inquiries*

    Plaintiffs first challenge the Department's application of the deliberative process privilege to emails discussing draft responses to questions from Congress. Several past decisions from this Court have treated draft responses to congressional inquiries as deliberative. *See, e.g.*, *Citizens for Resp. & Ethics in Washington v. Gen. Servs. Admin.*, No. 18-2071, 2021 WL 1177797, at *9 (D.D.C. Mar. 29, 2021) (concluding that internal "deliberations between [government counsel] regarding 'how [the agency] would move forward with responding to questions for the record' from the U.S. Senate Committee on Environment and Public Works" fell within the deliberative process privilege (citations omitted)); *Judicial Watch, Inc. v. U.S. Dep't of State*, 306 F. Supp. 3d 97, 115 (D.D.C. 2018) ("[D]raft responses generated by a nominee and an agency that deliberate about how to respond to questions from Congress about matters of agency policy qualify as deliberative and predecisional."); *Competitive Enter. Inst. v. U.S. Env't Prot. Agency*, 12 F. Supp. 3d 100, 119 (D.D.C. 2014) (finding the privilege properly applied to "materials [that] preceded decisions about whether and how to respond to phone calls

from individual Senators and how best to handle testimony before Congress"). The Department contends that the draft responses that it withheld here are not meaningfully distinguishable from the withholdings in those cases. Plaintiffs disagree, challenging several specific withholdings.

a.   <u>Bates Nos. 1022–23, 3823–31, and Doc. Nos. 91–92</u>

Bates Nos. 1022–23, 3823–31 and Doc. Nos. 91–92 contain emails disseminating "draft responses by [Department of Labor] Secretary Acosta to questions for the record (QFRs) stemming from a November 15, 2017, hearing of the House Committee on Education and the Workforce entitled, 'Examining the Policies and Priorities of the U.S. Department of Labor.'" Dkt. 31-4 at 91; Dkt. 31-5 at 2; Dkt. 31-5 at 136. The redacted portion of that email includes communications from Department officials regarding draft QFRs "prepared by Secretary Acosta's office about various [Department] issues, rulemaking, compliance efforts, and initiatives," and "consist[s] of major subject areas that [the draft] QFR[s] . . . covered" and "information pulled from the draft [QFR] in order to assess which topics should be discussed in the QFR." Dkt. 38-2 at 22, 104 (Suppl. *Vaughn* Index). Relying on this description and the unredacted portions of the documents, Plaintiffs argue that the redacted material consists of nothing more than a "bulleted list" of "major topics covered" and, as such, does not reflect the Department's internal deliberations about how to respond; merely describing the topics about which the House Committee had inquired is factual and not deliberative. *See* Dkt. 31-1 at 15; Dkt. 39 at 10–11.

To be sure, "[p]urely factual material usually cannot be withheld under Exemption 5"— that is, "unless [the withheld factual material] reflects an 'exercise of discretion and judgment calls.'" *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (internal quotation marks and citation omitted). Here, the Court concludes that the "synopsis of

11

the major issues covered," Dkt. 31-4 at 91, at least arguably reflects more than "purely factual

material." Although the description of the withholdings contained in the *Vaughn* index uses a

confusing shorthand—referring to the draft QFRs, rather than to the draft *responses* to the

QFRs—when read in context, it is evident that the Department is using the acronym to refer to

the draft responses. The *Vaughn* index, for example, notes that the withheld "QFRs" were

"prepared by Secretary Acosta's office"—and not by the House Committee—see Dkt. 38-2 at

22, 104, and, more importantly, the unredacted portions of the document itself refers to the

attached "draft response by Secretary Acosta to questions for the record" and contains "a brief

synopsis of the major issues covered" to assist agency commenters in their "review," Dkt. 31-5

at 2. And, more importantly, the caption that precedes the redactions reads; "OUTLINE OF

MAJOR TOPICS COVERED IN QFRs." *Id.*

       Plaintiffs accept this much, but they argue that a list of topics responsive to a

congressional inquiry is hardly deliberative. In their view, one could easily review a transcript of

the Committee hearing to discern the "major topics" covered by the QFRs, Dkt. 31-1 at 15 & n.4,

and the questions posed by a congressional committee do not constitute internal agency

deliberations—more aptly, they reflect congressional deliberations. The unredacted portions of

the documents itself and the *Vaughn* index, however, at least hint at an alternative view. The

document notes that the Secretary's draft QFR responses "address a wide range of [Department

of Labor] issues, programs, rulemakings, compliance efforts, and various initiatives," Dkt. 31-5

at 2, and the *Vaughn* index notes that the agency officials were deliberating about "which topics

should be discussed in the [responses to the] QFR[s]," Dkt. 38-2 at 22, 104. The *Vaughn* index

also suggests that the bullets include "information pulled from the draft" responses to the QFRs.

*Id.* Finally, the Department comes closer to making its case in the Supplemental Bickerstaffe

Declaration, which was not submitted until after Plaintiffs had filed their opposition and cross-motion. Dkt. 36-2 at 4 (Supp. Bikerstaffe Decl. ¶ 11). According to Bikerstaffe, the Department was engaged in an extended deliberation about "which topics to include in the QFR" and, relatedly, about "what information should be included in the final QFR." *Id.* And he asserts that "there were significant back-and-forth discussions between . . . various agencies [within the Department] regarding which information should be included in the final QFR." *Id.*

It is, of course, possible that in creating the bullet list agency officials were required to "cull[]" topics "from the much larger universe" of questions, *Ancient Coin Collectors Guild*, 641 F.3d at 513, and that the culling process reflected internal agency deliberations on questions of policy or communications, *see Protect Democracy Project, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 569 F. Supp. 3d 25, 43 (D.D.C. 2021) (noting that "the compilation of the list [can] reflect[] . . . a process of selection or organization that was part of [the] agency's deliberative process" (quotation marks and citation omitted) (fourth alteration in original)). Indeed, the Supplemental Bickerstaffe Declaration says as much, asserting that "[t]he withheld information . . . does not merely reflect factual information, nor is it factual in nature, but reflects carefully selected ideas that [the Department] considered including within the QFR." Dkt. 36-2 at 4 (Supp. Bickerstaffe Decl. ¶ 11). But even with this final assertion, the Court is unpersuaded that the Department has offered sufficient detail "to enable the court and the opposing party to understand the withheld information in order to address the merits of the claimed exemptions." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 196 (D.C. Cir. 2006). The agency bears the burden, and it cannot meet that burden with vague or conclusory assertions. As things now stand, the Court cannot determine whether the Department was working from a list of questions

propounded by the House Committee, whether it had prepared its own list of issues that it

wanted to address, or whether it was picking and choosing from questions raised at the hearing.

Without this more detailed information, the Court must deny the Department's motion

and Plaintiffs' cross-motion.[1]

    b. <u>Docs. Nos. 96 and 133</u>

The next documents Plaintiffs challenge are Doc. Nos. 96 and 133.  Those documents

contain an email exchange in which a "proposed letter to Senator Lankford with the Director's

edits included" was shared, alongside an instruction that the letter was to be "process[ed] for

OSEC review."  Dkt. 31-6 at 2, 6; *see also* Dkt. 31-3 at 5 (Townsend Decl. ¶¶ 29, 31).  In

responding to that email containing the "proposed letter," an OFCCP employee writes, "Heads

up:" followed by five lines of redacted text.  Dkt. 31-6 at 6.  The Department explains that it

redacted that passage because it was "part of [the Department's] process regarding if and when it

should respond to the inquiry and what information should or should not be included in the final

response."  Dkt. 36-6 at 4 (Suppl. *Vaughn* Index).  But Plaintiffs dispute this characterization,

contending that the redacted passage was not part of a predecisional deliberative process; rather

the "'purpose of' th[e] [response] 'was to alert' the recipients to a particular fact" and thus was

not deliberative.  Dkt. 31-1 at 16 (quoting *Mayer, Brown, Rowe & Maw LLP v. IRS*, 537 F. Supp.

2d 128, 139 (D.D.C. 2008), *aff'd sub nom. Mayer Brown LLP v. IRS*, 562 F.3d 1190 (D.C. Cir.

2009)).

Plaintiffs are right that a communication that merely alerts the recipient to a decision

already made is not appropriately withheld under the deliberative process privilege.  *See, e.g.,*

---

[1] These documents fall into "Category A" in the Department's groupings.  A discussion of
whether the Department has satisfied the reasonably foreseeable standard with respect to the
documents in Category A follows.

*Mayer, Brown, Rowe & Maw LLP*, 537 F. Supp. 2d at 139 (rejecting the agency's argument that it properly withheld a document that alerted the recipient of a decision). The Court, however, is not in a position to determine which party's characterization of the record is correct because the *Vaughn* index describing these documents and the declarations the Department has submitted state that the withheld communication concerns "an inquiry sent by the Institute for Workplace Equality," not Senator Lankford. Dkt. 30-5 at 4–5 (*Vaughn* Index); Dkt. 36-6 at 4–5 (Suppl. *Vaughn* Index); Dkt. 36-2 at 4 (Suppl. Bickerstaffe Decl. ¶ 12). Perhaps an inquiry from the Institute for Workplace Equality had some impact on whether and how the Department should respond to the letter from Senator Lankford, but, if so, the Department needs to offer a better explanation for the withholding than it has offered to date. The Court may not guess, and the Department's description of the materials as "reflect[ing] OFCCP's internal deliberation about the timing for providing a response to an inquiry . . . and factors that hindered OFCCP from providing a final response," Dkt. 36-2 at 4 (Suppl. Bickerstaffe Decl. ¶ 12), is simply bewildering.

The Court will, accordingly, deny summary judgment to both parties as to Doc. Nos. 96 and 133 but cautions the Department that it will have one more chance—and only one more chance—to meet its burden. *See Mountgordon*, 691 F. Supp. 3d at 87 (permitting agency another opportunity to carry its burden of "justifying its decision to withhold" material).

2.      *Press inquiries*

Plaintiffs also challenge the Department's redaction of a series of records in which OFCCP employees discuss how to respond to inquiries from the press about the religious accommodation directive. *See* Dkt. 31-1 at 17–20. The Department maintains that the deliberative process privilege applies to these documents because they reflect "[a]gency

deliberations regarding how to address various questions from news media . . . regarding the

Religious Exemption Directive." Dkt. 30-2 at 12. Moreover, "[b]ecause [the Office of Public

Affairs ("OPA")] is the final arbiter regarding press inquiries and OPA is clearly seeking

OFCCP's opinions [in these documents]," the Department argues that "the give-and-take that

precedes OPA's media response" is clearly predecisional. Dkt. 36 at 9; *see also Judicial Watch,*

*Inc. v. U.S. Dep't of State*, 349 F. Supp. 3d 1, 7 (D.D.C. 2018) (noting the "numerous district

court opinions [that] hold deliberations over 'how to respond to media inquiries' are protected

when 'generated as part of a continuous process of agency decision making'" (quoting *Judicial*

*Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 208–09 (D.D.C. 2010))).

Plaintiffs do not dispute that prior drafts of responses to media inquiries are, as a general

matter, subject to the deliberative process privilege. *See Reps. Comm. for Freedom of the Press*,

3 F.4th at 361 ("[T]he deliberative process privilege shield[s] from disclosure . . . internal

deliberations about whether to adopt and how to promote and defend a particular policy desired

by the agency."). Rather, their central contention is that while OPA may have final approval

over the Department's responses to the media, the redacted draft responses OFCCP provided are

"clearly of a final nature" and any subsequent review by OPA was not meaningful. Dkt. 31-1 at

17. Plaintiffs assert that the OFCCP draft responses were not "generated before the adoption of

an agency policy," and thus were neither predecisional nor deliberative. *Id.* (quoting *Judicial*

*Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006)).

It is true that "a document can lose its predecisional character—and the protections of the

privilege—if an agency adopts the document as its own." *Judicial Watch, Inc.*, 847 F.3d at 739.

For example, if "talking points represent the final, settled 'party line' and are circulated to

employees of the agency accordingly," those talking points might represent the final, no-longer-

16

deliberative view of the agency. *Am. Ctr. For L. & Justice v. Dep't of Justice*, 392 F. Supp. 3d 100, 107 n.1 (D.D.C. 2019) (quoting *Judicial Watch, Inc.*, 349 F. Supp. 3d at 10). After all, if a document authorizes an employee to provide a specific response to the media on behalf of the agency, it is reasonable to infer that the response detailed in the document represents the agency's view—and that future agency deliberations would not be chilled by requiring disclosure and the disclosure would not risk public confusion about the agency's position. But, on the other hand, the disclosure of conflicting, tentative, or unapproved views contained in a draft press statement would risk chilling future deliberations and creating public confusion.

The question presented here is thus whether the Department adopted the redacted draft responses prepared by the OFCCP at OPA's request, such that those draft responses represent its final view of the matter. Or more precisely put, given the procedural posture: whether the Department has carried its burden by "provid[ing] the Court with a reasoned and sound basis for concluding that the record at issue was—and remained—predecisional." *100Reporters*, 602 F. Supp. 3d at 62.

      a.   <u>Bates Nos. 2644–86</u>

In some of the records Plaintiffs challenge, it is clear from the face of the documents themselves and the declarations provided that the redacted material reflects predecisional opinions about the best way to answer the relevant media inquiry. Bates Nos. 2644–86 contain a discussion between OPA and OFCCP employees about how to respond to a press inquiry from Buzzfeed. According to the Department, the redacted material reflects "an opinion about how to respond to a news inquiry," which represented the author's "preliminary assessment of how [the Department] could appropriately respond to the inquiry," as well as another individual's response "detailing one possible way that OPA could enhance the response." Dkt. 30-4 at 37

(*Vaughn* Index).  Such back and forth discussion about the best position for the agency to adopt is clearly deliberative.  *See Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice*, 45 F.4th 963, 972 (D.C. Cir. 2022) (explaining that "[a] record is pre-decisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision'" and is "deliberative in nature if it 'reflects the give-and-take of the consultative process'" (first quoting *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992), then *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  It is also predecisional because, unlike other materials of a similar nature that the Department has withheld, there is no reason to believe that this "preliminary assessment" was ever adopted as a final, agency response.  To the contrary, as the Plaintiffs themselves note, "the Buzzfeed News article to which these records relate confirms that OFCCP did not respond to its request for comment."  Dkt. 31-1 at 20.[2]

    For these reasons, the Court concludes that the Department permissibly treated Bates Nos. 2644–86 as subject to the deliberative process privilege.[3]

---

[2] Plaintiffs speculate that because OFCCP declined to respond to this story, at least some of the redacted material is not deliberative and predecisional but rather "contain[s] instructions for staff, unrelated to providing comment to Buzzfeed."  Dkt. 31-1 at 20.  But the declaration the Department proffers attests that "this information—an intra-DOL exchange of ideas—assisted OPA with determining an appropriate response to the inquiry."  Dkt. 36-2 at 6 (Suppl. Bickerstaffe Decl. ¶ 17).  And even if the "preliminary assessment," which appears to occupy several lines of text, included a recommendation that the Department decline to comment, that recommendation would still be deliberative.

[3] These records are labeled by the Department as falling into "Category I" of its withholdings.  The Court addresses below whether the Department has satisfied its burden to demonstrate reasonably foreseeable harm with respect to these documents.

b.  Bates Nos. 4024–26

Bates Nos. 4024–26, in contrast, appear to contain a response that was "adopt[ed]" by the Department "as its own." *Judicial Watch, Inc.*, 847 F.3d at 739.  That record contains an exchange that begins with an email from an OPA employee that shares an inquiry from a Buzzfeed reporter with OFCCP and other Department of Labor employees and proposes a response, which is redacted in the version of the document that the Department produced to Plaintiffs.  Dkt. 31-5 at 133–34.  After a back-and-forth exchange, the director of OFCCP "propose[s]" another response, which is also redacted.  *Id.* at 132.  Then, a little over four hours later, the OPA employee who initiated the exchange responds with, "Got approval—thank you!" *Id.*  Plaintiffs do not challenge all the redactions in this exchange, only the redacted response that immediately preceded the email indicating that something was approved.  Dkt. 31-1 at 25 n.16. If that "something" was the OFCCP director's response, Plaintiffs argue that the Director's response it is no longer predecisional and cannot be withheld pursuant to the deliberative process privilege.  *Id.* at 25.

In countering Plaintiffs' arguments, the Department does not attempt to account for the statement that seems to indicate the Director's draft was "approv[ed]"—by, for example, explaining that the Director's proposal was not a new draft but concerned some other facet of the response.  Instead, the Department reiterates that the redacted portion represents a "back-and-forth discussion[] . . . regarding what should be included in the response," Dkt. 36-2 at 8 (Suppl. Bickerstaffe Decl. ¶ 22).  Nor does the *Vaughn* index provide any further clarification on this score.  Dkt. 30-4 at 75 (*Vaughn* Index) (stating that the "withheld information consists of the OPA employee's preliminary assessment of the question as well as a proposed response which

was not necessarily adopted, as well as another response proposed by the OFCCP director"); Dkt. 38-2 at 110 (Suppl. *Vaughn* Index).

An agency's adoption of a draft press release cannot be established through an agency's "vague or equivocal statements implying that a position presented in a deliberative document has merit," and the Court therefore agrees with Plaintiffs that the Department must do more here. *Judicial Watch, Inc.*, 847 F.3d at 739; *see also 100Reporters*, 602 F. Supp. 3d at 62 (explaining that to withhold a record under the deliberative process privilege, an agency need not "trace the lineage of each draft or evidently deliberative record to ensure that the agency did not, at some point, adopt the predecisional record," but instead must "provide the Court with a reasoned and sound basis for concluding that the record at issue was—and remained—predecisional").

Because the document plainly states that the proposed response was "approv[ed]" just hours after the internal request seeking "urgent" approval was circulated, and because the Department has offered no explanation that might counter the evidence that the redacted paragraph was formally adopted by the Department without a modification of any sort, the Court will grant summary judgment in Plaintiffs' favor with respect to Bates Nos. 4024–26.

        c.   <u>Bates Nos. 2329–37 and Doc. Nos. 8–9</u>

With respect to Bates Nos. 2329–37 and Doc. Nos. 8–9, the Department has failed to provide sufficient information for the Court to ascertain whether the redacted passage was merely a suggested response to the press or was the final approved response. The material redacted from this email exchange is described, in the email, as a "summary of [the] directive" that had been drafted by the Director of the OFCCP and "sent to OPA at their request for providing in response to press inquiries, which would be the basis for the talking points." Dkt. 31-5 at 46. The email notes that the redacted summary had been "reviewed" by "ASP" or the

Assistant Secretary of Policy, who had "provided edits as well." *Id.* at 49. Subsequent portions of the email chain discuss preparing "a general FAQ consistent with the language" provided by the Director, but no further discussion of that end-product appears in the email chain. *Id.*

The Department represents that the redacted summary was a "prepared draft statement for press inquiries regarding the religious exemption directive . . . [that] preceded the final statement that was approved by [the Office of the Secretary]." Dkt. 36 at 7; *see also* Dkt. 30-4 at 35. The Department's revised *Vaughn* index, moreover, reiterates that the redacted "draft statement was sent to the Department's Office of the Secretary for final review and comment." Dkt. 38-2 at 50 (Suppl. *Vaughn* Index). And the Supplemental Bickerstaffe Declaration attests that "the withheld information represents OFCCP's feedback or suggested response but is *not necessarily* reflective of the actual final response that OPA sent." Dkt. 36-2 at 5 (Suppl. Bickerstaffe Decl. ¶ 13) (emphasis added). None of these statements, however, squarely addresses the issue at hand—that is, whether the response drafted by OFCCP was the one that the Office of the Secretary and/or OPA ultimately approved and provided to the press or incorporated into the final FAQs. The Department bears the burden of proof, and an assertion that the redacted material was "not necessarily" reflective of the final response, is far from assuring; at best, it suggests that the declarant did not bother to compare the withheld material with the final product.

The Court, accordingly, concludes that a genuine issue of material fact precludes the Court from granting summary judgment to either party with respect to these records.

        d.    <u>Bates Nos. 2272, 3993–98</u>

The same can be said concerning the portion of an email chain containing "a draft response to an inquiry from the public regarding the religious exemption directive." Dkt. 30-4 at 73 (*Vaughn* Index). The Department explains that it withheld these records pursuant to the

deliberative process privilege because "[t]he draft response was not in final form," "was part of OFCCP's process for determining what information should and should not be included in the final response," and "preceded the final response that was sent to the requester." Dkt. 38-2 at 46 (Suppl. *Vaughn* Index). But once again, none of these descriptions of the redacted passage explicitly state that the redacted passage was not ultimately adopted by the agency. And the unredacted portions of the records give the Court reason to question the predecisional nature of the redactions.

The email exchange begins with "a time-sensitive inquiry regarding last week's directive" and an OPA proposal to "direct [the inquiring party] to [a particular] section of the first directive." Dkt. 31-5 at 73–74. In response, the Director of OFCCP writes:

> I know there is time sensitivity. I would propose the following, which I prepared myself with . . . our career Acting Deputy Director. Please check with [the Office of the Secretary ("OSEC")] as well before sending. Please note, I will be working on a more comprehensive response to these inquiries with the Solicitor's Office and should have that ready by tomorrow.

*Id.* The Director's proposed response is then redacted. *Id.* The exchange ends with the OPA employee thanking the Director. *Id.* at 75.

This context is important. As the D.C. Circuit has explained, "[t]he identity of the parties to the memorandum is important; a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Coastal States Gas Corp.*, 617 F.2d at 868. In response, the Department relies on the Supplemental Bickerstaffe Declaration, which notes that the Director's request that OPA "check with OSEC" demonstrates that, although "the OFCCP's portion of the review was complete, OPA needed to get additional feedback from other agency personnel prior to sending a final response to the media

22

organization." Dkt. 36-2 at 5 (Suppl. Bickerstaffe Decl. ¶ 14). Once again, however, the Department sidesteps the question whether the proposed response was adopted by the Department, and, given the seniority of the drafter and the "time sensitivity" emphasized by the participants in that email exchange, Dkt. 31-5 at 71, the Court cannot assume—absent any evidence beyond the Director's request that OPA "check with OSEC"—that the proposed response was, in fact, modified in any way before it was released.

The Court, accordingly, concludes that a genuine issue of material fact precludes the Court from granting summary judgment to either party with respect to these records.

e.  Bates Nos. 2308–25

The same reasoning applies to Bates Nos. 2308–25. In those records, OFCCP staff and other agency employees discuss questions OPA forwarded from a Buzzfeed reporter about the "religious directives." Dkt. 31-6 at 15. Plaintiffs do not challenge many of the redactions throughout those records; they do, however, contend that the deliberative process redactions on Bates Nos. 2322 and 2325 are improper. Dkt. 31-1 at 19. Those two pages contain a message from the Office of the Assistant Secretary of Policy ("OASP") proposing "a couple tweaks" to a redacted passage that follows. Dkt. 31-6 at 11, 14. The email chain contains the subject line: "TIME SENSITIVE: FW: BuzzFeed News reaching out the OFCCP religious liberty directive." *Id.*

The Department contends that the redacted tweaked passage contains an "opinion and recommendation from OFCCP and ASP personnel detailing one possible way that [the Department] could respond to the inquiry." Dkt. 38-2 at 49 (Suppl. *Vaughn* Index). And Bickerstaffe attests that "the redacted response does *not necessarily* reflect the final response OPA sent to Buzzfeed." Dkt. 36-2 at 6 (Suppl. Bickerstaffe Decl. ¶16) (emphasis added). But,

as noted above, the assertion that the redacted material "does not necessarily reflect the final response" provides little comfort; at no point does the Department attest that the tweaked, redacted passage in question remained predecisional and deliberative.

That omission is a meaningful one when combined with the fact that the redacted passage is characterized as making "a few tweaks" to a response prepared by the Director of OFCCP, Dkt. at 31-6 at 11; the Department stressed that the inquiry was "time sensitive;" and the OPA employee who initially shared the reporter's question responded to the email containing the redacted passage with: "Thank you everyone!"  *Id.*  As explained above, "the relative positions in the agency's 'chain of command' occupied by the document's author and recipient" is meaningful when considering whether a particular record is predecisional and deliberative.  *Pub. Emps. for Env't Resp. v. Env't Prot. Agency*, 213 F. Supp. 3d 1, 15 (D.D.C. 2016) (quoting *Senate of P.R.*, 823 F.2d at 586); *see also Jud. Watch, Inc.*, 349 F. Supp. 3d at 10 (finding that an email that "shares press guidance," followed by two responses thanking the sender for sharing, was "neither predecisional nor deliberative").

Plaintiffs have thus raised a sufficient question as to whether the redacted response represents the Department's final position regarding the reporter's question to preclude the Court from granting either party summary judgment with respect to those two records.

f.    Bates Nos. 4001–06

Likewise, in Bates No. 4001–06, the Department withholds portions of an email exchange concerning an inquiry from Bloomberg Law about "a line about rulemaking in one of [the Department's] recent directives."  Dkt. 31-5 at 126.   The Department explains that "[t]he withheld information consists of questions and recommendation by OPA to OFCCP regarding which direction OFCCP should go towards regarding commenting on the status of rulemaking.

The advice was utilized by OFCCP to determine how to approach the situation and preceded the final decision regarding the type of response to provide to Bloomberg Law." Dkt. 38-2 at 107 (Suppl. *Vaughn* Index). Plaintiffs only challenge one small portion of the withholding: That response instructing the recipient to "[p]lease put the following," which is followed by a redacted passage. Dkt. 31-5 at 126.

In that passage, according to Plaintiffs, "OFCCP's director has provided an instruction— one that embodies the agency's established policy—and it is neither deliberative nor predecisional." Dkt. 31-1 at 22. The Court agrees that the redacted message has an air of finality that the Department does not address in its *Vaughn* indices or declarations. True, "[a] document is not final solely because nothing else follows it." *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). But here, something did follow this redacted passage—a response from an OPA employee saying, "Ok thank you," Dkt. 31-5 at 126—which seems to indicate that the OFCCP Director had the final word on the topic. And the Department only answers this argument by explaining that "the withheld material in these documents represents OPA and OFCCP opinions about how to respond to the inquiry but are not necessarily reflective of the actual response that OPA sent." Dkt. 36-2 at 7 (Suppl. Bickerstaffe Decl. ¶ 19). That observation does not address whether the redacted portion is, as Plaintiffs contend, "disqualified from [the] exemption because [it] ha[s] become final rather than deliberative," Dkt. 31-1 at 22 (alterations in original) (quoting *Ecological Rights Found. v. EPA*, No. 19-980, 2021 WL 535725, at *17 (D.D.C. Feb. 13, 2021)).

The Court will, accordingly, deny both parties' motions for summary judgment with respect to the final redacted passage in this email chain.

g.    Bates Nos. 578–86, 593–98, 613–16, 621–55

The final withholdings that Plaintiffs challenge relating to the OFCCP press inquiries are found in Bates Nos. 578–86, 593–98, 613–16, and 621–55.  These pages contain redactions pursuant to both the deliberative process and attorney-client privileges, although the Court addresses only the former at this point in the opinion.  The Department explains that it withheld "communications from [the Civil Rights and Labor-Management Division of the Office of the Solicitor ("CRLM")], OFCCP's legal counsel, outlining a summary of legal research that would assist OFCCP with responding to an inquiry from Buzzfeed about how many cases OFCCP refers to [the Department of Justice] and associated data."  Dkt. 38-2 at 17 (Suppl. *Vaughn* Index).  Plaintiffs advance two reasons why these withholdings are improper:  First, they contend that these records contain factual material that is not properly covered by the deliberative process privilege.  Dkt. 31-1 at 22–23.  Second, they argue that one redacted passage on Bates No. 651 is not predecisional because it describes an action already taken by the Department.  *Id.* at 18–19.

Beginning with the first of these contentions, Plaintiffs are correct that "[p]urely factual material usually cannot be withheld under Exemption 5."  *Ancient Coin Collectors Guild*, 641 F.3d at 513.  That general rule, however, comes with an important caveat:  If "'the selection of the facts thought to be relevant' is part of the deliberative process," that factual material may be reflective of a "policy-oriented judgment" sufficient to warrant the privilege's protection.  *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 465 (D.C. Cir. 2014) (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993)) (emphasis omitted).  This is because "the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material."  *Mapother*, 3 F.3d at 1537.  "[T]he legitimacy of withholding" thus "does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on

whether the selection or organization of facts is part of an agency's deliberative process."

*Ancient Coin Collectors Guild*, 641 F.3d at 513. (citing *Montrose Chem. Corp. of Cal. v. Train*,

491 F.2d 63, 71 (D.C. Cir. 1974)).

Here, Plaintiffs argue that the withheld material is "purely factual and retrospective" in

nature; the email chain correspondence addresses "'an inquiry from a media organization [about]

instances in which OFCCP has . . . refer[red] a case under investigation to the Department of

Justice . . . for litigation,'" and "the ensuing email thread consists of a variety of [Department of

Labor] personnel pulling the relevant data," Dkt. 31-1 at 22–23.  The Department counters by

arguing that, although the redacted portions of the email correspondence contain certain factual

information, that material reflects "a cross-agency collaboration between OFCC, OPA, and [the

Office of Solicitor ("SOL")] regarding how to respond to a Buzzfeed inquiry."  Dkt. 36-2 at 7

(Supp. Bickerstaffe Decl. ¶ 20).  Moreover, in addition to containing legal advice regarding the

criteria used by the Department in deciding "whether to seek to disbar a contractor," the

correspondence also reflects "the steps that SOL, OPA, and OFCCP took to determine the total

volume of cases that were referred to [the Department of Justice] and the deliberation over what

should be included in the response to [Buzzfeed] inquiry."  *Id.* at 78.  In support of this

characterization, the Department points to an exchange in which an OPA employee responds to

an answer provided by OFCCP by asserting that he was asked to "pare down our response" and

"want[ed] to be sure that [the following] was accurate."  *Id.* at 8.

After reviewing the redaction in the context of the overall exchange, and according the

Department's declaration and *Vaughn* index a presumption of good faith, *see SafeCard Services,*

*Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), the Court is persuaded that any factual

material that the Department redacted was part and parcel of the internal deliberations about how

best to respond to the inquiry and that it reflected far more than the collection and reporting of data maintained by the Department regarding past activity. The redacted material includes "background about why certain cases are referred to" the Department of Justice, Dkt. 31-4 at 2; the author of another redacted passage suggests "speaking directly with" an SOL lawyer "for more details about either case," *id.* at 11; and, as the Department stresses, other portions of the email chain make clear that the discussion focused on how much to pare back the response, while still maintaining accuracy, *id.* at 29. The Department's good faith, moreover, is confirmed by the passages that it did disclose, which refer to the type of hard data that Plaintiffs speculate is reflected in the redacted material. *See id.* at 44 ("[W]e suggest the following response: DOL has referred two cases arising from compliance reviews, and no cases arising from complaints, to DOJ since 2001."). In short, the Court is persuaded that "the factual material contained in the [redactions] reflects the[] drafters' discretionary judgment regarding the particular information" to include—and to exclude—in responding to the press inquiry, and, as such, constitutes the type of deliberative, predecisional material that the privilege protects. *Cause of Action Inst. v. Exp.- Imp. Bank of the U.S.*, 521 F. Supp. 3d 64, 80 (D.D.C. 2021).

Plaintiffs are on no firmer ground, moreover, if their argument is cast as a challenge to the segregability of the records. The Department avers that it "[c]onducted a line-by-line review of each page" and "considered whether factual information could be segregated from information subject to the deliberative process privilege and attorney[-]client privilege." Dkt. 30-3 at 15 (Bickerstaffe Decl. ¶¶ 13–14). When supported by a declaration from an agency official with relevant knowledge, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117

(D.C. Cir. 2007). And, as noted above, the Department's good faith effort to segregate privileged and non-privileged material is confirmed by its release of at least one passage containing the type of hard data that Plaintiffs seek. *See also* Dkt. 36-2 at 6 (Suppl. Bickerstaffe Decl. ¶ 15) ("It should be noted that DOL released the number of cases that it referred."). Plaintiffs, in turn, have failed to offer any evidence that would call into question the Department's good faith.

Plaintiffs do, however, identify statements that they contend "simply describe[] already-made and in-place policy choices," *see* Dkt. 31-1 at 23 (quoting *Reps. Comm. for Freedom of the Press*, 3 F.4th at 367), and that contention stands on firmer ground. Included in the intra-agency discourse about the Buzzfeed reporter's questions is an "inquiry from OFCCP, seeking clarification about the information that CRLM provided." Dkt. 38-2 at 17 (Suppl. *Vaughn* Index). Plaintiffs challenge the Department's decision to withhold portions of the response to this clarifying inquiry, in which Department of Labor attorneys explain why two specific cases were referred to the Department of Justice rather than litigated by the Department of Labor. Dkt. 31-4 at 66. Plaintiffs argue that the redacted answer "necessarily explains an action already taken" and thus is not predecisional. Dkt. 39 at 14.

"[D]ocuments that discuss, describe, or defend an already-determined agency policy" are not covered by the deliberative process privilege. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 363. So, to the extent that the redacted material explains the Department's "settled position," that material would not be properly withheld. *Sierra Club*, 592 U.S. at 268. The Department, however, insists that the redacted material does not explain an action the Department already took; it asserts that the redacted material related to how the Department should respond to Buzzfeed's *then-pending* inquiry and not to the Department's *past* decision

about referring the two cases to the Department of Justice.  Dkt. 36 at 8.  Perhaps.  But the declaration the Department proffers in support of its withholdings does not explain how the redacted response to OPA's question about why the cases were referred relates to the Department's response to Buzzfeed.  Instead, Bickerstaffe merely attests that the "remaining withheld information reflects the legal factors that [the Department of Labor] considers when determining whether it should seek disbarment as a potential remedy in litigation before an Administrative Law Judge, or considers referring a case to the Department of Justice to litigate in [f]ederal court."  Dkt. 36-2 at 5 (Suppl. Bickerstaffe Decl. ¶ 15).

    The Department might have good reason for withholding the redacted material; that material might constitute predecisional deliberations about how to respond to Buzzfeed's inquiry or how to best enforce the Department's regulations.  *See 100Reporters*, 602 F. Supp. 3d at 69 (noting that "Exemption 5 does not merely protect deliberations over the formulation of generally applicable agency policies; it also protects deliberations regarding discrete agency decisions applying those policies, at least where those decisions involve some exercise of discretion").  But without any evidence—in a declaration or any other materials—addressing how the redacted material contributed to a particular Department decision, the Court cannot determine whether the redacted material falls within the deliberative process privilege.  *See Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) ("[T]he D.C. Circuit has said that '[t]he failure to specify the relevant final decision constitutes a sufficient ground for remanding [Exemption 5 deliberative process claims] to the district court." (second and third alterations in original) (quoting *Senate of P.R.*, 823 F.2d at 585)); *Senate of P.R.*, 823 F.2d at 585 ("[T]o approve exemption of a document as predecisional,

a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'" (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983))).

The Court, accordingly, concludes that the Department has justified its invocation of the deliberative process privilege to redact passages in Bates Nos. 578–86, 593–98, 613–16, and 621–55, except for the portion of Bates No. 651 in which Department attorneys explain why certain cases were referred to the Department of Justice. The Court will separately consider the Department's invocation of the attorney client privilege with respect to Bates No. 651 below.

      3.    *Inquiries from non-profit organizations*

In addition to challenging the Department's decision to withhold certain communications discussing how best to respond to inquiries from the press and from Congress, Plaintiffs also challenge the Department's withholding of several records that discuss responses to inquiries from non-profit organizations. *See* Dkt. 31-1 at 25–26. Plaintiffs argue that, as a categorical matter, these records "do not fall within the scope of the deliberative process privilege [because] they encompass discussions about proposed responses to not-for-profit organizations," and "while the deliberative process privilege may apply to responses to press inquiries and Congressional inquiries, [the Department] cites to no case in this District . . . holding that the privilege applies to responses to inquiries from non-profits," Dkt. 31-1 at 25–26 (quoting *People for Ethical Treatment of Animals v. Dep't of Health & Hum. Servs.*, 464 F. Supp. 3d 385, 396 (D.D.C. 2020)).

The Department, in turn, disputes that the identity of the entity making the inquiry matters. In the Department's view, if the deliberative process privilege "may extend to internal deliberations over how to best promote or preserve an existing policy in the midst of public debate over whether the government should have such a policy," *Reps. Comm. for Freedom of*

*the Press*, 3 F.4th at 362, it should also extend to draft responses to inquiries from "a non-profit organization like the Institute [for Workplace Equality], which would likely publicize the Department's response to its members," Dkt. 36 at 14.

The Court agrees with the Department that the relevant inquiry does not inexorably turn on who asked the question. The test for whether the deliberative process privilege applies, after all, is whether the document reflects predecisional deliberations regarding a matter within the agency's managerial, organizational, or administrative ambit. The ultimate audience for the agency's response matters only to the extent it is relevant for establishing whether communication constituted an "inter-agency or intra-agency" one, 5 U.S.C. § 552(b)(5), and whether the preceding deliberations concern a matter within the agency's authority. The question a court must answer when an agency seeks to apply the deliberative process privilege to an internal discussion about how to respond to an inquiry from a third party is whether the "document[] [was] generated during an agency's deliberations about a policy, as opposed to [being a] document[] that embod[ies] or explain[s] a policy that the agency [has already] adopt[ed]." *Sierra Club, Inc.*, 592 U.S. at 263.

The Court recognizes the difficulty that such an inquiry can present. The line between documents that reflect internal deliberations about "how best to promote or preserve an existing policy in the midst of public debate over whether the government should have such a policy" and "documents that discuss, describe, or defend an already-determined agency policy" is a fine one. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 362–63. And although the former generally falls within the privilege, the latter does not. This means, of course, that not all communications about how to respond to a non-profit will fall within the deliberative process privilege—just like not all discussions about how to respond to an inquiry from the press or the Congress will not.

32

The Court must, accordingly, consider the invocation of the privilege on a document-by-document basis.

Applying these principles to the records at issue here, the Court first concludes that the Department has met its burden of showing that the records pertaining to the inquiry from the Institute for Workplace Equality and the National Center for Transgender Equality (Bates Nos. 331–36, 1266, 2440, 2586–91, 2071–77, 3703 and 3739) are privileged. The Department describes these documents in the Supplemental Bickerstaffe Declaration as "pertain[ing] to a cross-DOL agency collaborative review by OSEC, OASP, OPA, and OFCCP of an inquiry sent by the Institute for Workplace Equality regarding their interpretation of the highly sensitive and media generating religious directive." Dkt. 36-2 at 8 (Suppl. Bickerstaffe Decl. ¶ 22). The Department further explains that "[r]eviewing and responding to this inquiry necessitated fleshing out public misunderstanding or misinterpretation of the religious exemptive directive." *Id.* And each of these records are described in the *Vaughn* index as part of the "back-and-forth discussion" that occurred "prior to OFCCP making a decision regarding how to respond to the inquiry," Dkt. 30-4 at 2 (*Vaughn* Index); *see also id.* at 16, 36, 68, or as drafts that were subject to "comments and edits" or that provided "information" that was "utilized . . . to make a final decision regarding what information should be included in the final response to the organization," *id.* at 52; see also *id.* at 40–41, 110.

As a result, these records, like those in *Reporters Committee for Freedom of the Press*, contain deliberations about "how to best promote and ensure the continuation of the [Department's] policy in the face of intense congressional and public criticisms of the agency's

preferred policy approach," and are thus sufficiently predecisional and deliberative to fall within the deliberative process privilege.  3 F.4th at 363.[4]

      4.     *"Secret law"*

Plaintiffs' next set of deliberative-process challenges takes a different tact: instead of focusing on who asked the question or whether the redacted material reflects facts, Plaintiffs assert that the redacted response itself takes the form of "secret law," which cannot be properly withheld by the Department under Exemption 5.  Documents that reflect an agency's "working law"—that is, "opinions and interpretations which embody the agency's effective law and policy"—are not protected by the deliberative process privilege.  *Sears*, 421 U.S. at 153 (internal quotation marks and citation omitted); *see also Tax'n With Representation Fund v. I.R.S.*, 646 F.2d 666, 677 (D.C. Cir. 1981) (explaining that Exemption 5 does not "protect communications that implement an established policy of an agency").  As a result, agencies are "required to disclose . . . document[s] that represent[] a conclusive or authoritative statement of [their] polic[ies]," including instructions from a "higher authority . . . [to] a subordinate on how the agency's general policy applies to a particular case."  *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 9 (D.C. Cir. 2014).

      a.    <u>Bates Nos. 2151–58 and 3768</u>

Plaintiffs contend the redacted material in Bates Nos. 2151–58 and 3768 is just that: a response to a "regional OFCCP employee seeking guidance" on how the Religious Accommodation Directive applies, and as such, should be disclosed.  Dkt. 31-1 at 24.  The Department describes the exchange as "reflect[ing] the back-and-forth discussions that occur

---

[4] The Department classifies these documents as belonging in Categories B, K, and I.  The Court will address below whether the Department has satisfied the foreseeable-harm requirement with respect to these records.

between agency personnel regarding how to resolve" "novel issues OFCCP compliance officers could face when implementing the directives." Dkt. 30-4 at 28. But the unredacted portions of the documents themselves cast doubt on the Department's assertion that the emails contained a deliberative back-and-forth, rather than just an exchange.

In response to an email from the acting deputy director of OFCCP announcing the issuance of two new policy directives, one of which was the Religious Accommodation Directive, a regional employee poses a question. Dkt. 31-5 at 19–20. After the Acting Deputy Director indicates that it is appropriate for the employee to ask that question, the employee states that she "ran across an issue," which she goes on to describe in a redacted portion of the email. *Id.* at 19. The Acting Deputy Director then provides a response to that employee, which she forwards to the Deputy Regional Director for the Midwest, and the Deputy Regional Director indicates that they "would agree" with the (redacted) response the that Acting Deputy Director had provided to the employee. *Id.* at 21.

As far as the Court can discern, this exchange does not reflect the type of "back-and-forth" indicative of deliberation and, instead, seems to offer a definitive answer to the employee's question about how to apply agency policy in a particular scenario. *See Access Reports*, 926 F.2d at 1195 ("A key feature under both the 'predecisional' and 'deliberative' criteria is the relation between the author and recipients of the document. A document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient. By contrast, one moving from senior to junior is far more likely to manifest decision[-]making authority and to be the denouement of the decision[-]making rather than part of its give-and-take."). The Department, moreover, never avers that the response

to the employee's question was "predecisional."  *See* Dkt. 36; Dkt. 30-4 at 27–28, 70 (*Vaughn* Index).

The principles prohibiting the withholding of "working law" apply not only to "formally binding" documents but also to those that are "routinely used and relied upon by field personnel."  *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) (quotation marks and citation omitted).  An agency cannot withhold the documents it relies on in "the discharge of its regulatory duties and its dealings with the public" merely because the document "is not designated as . . . final."  *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1982) (internal quotation marks and citation omitted).  For the reasons explained above, the Court concludes that the Department has failed to satisfy its burden of justifying its decision to withhold portions of Bates pgs. 2151–58 and 3768 based on the deliberative process privilege.

        b.   <u>Bates Nos. 2252–66, 2275, and 3730–31</u>

The Department's arguments fare better, however, with respect to the remaining documents that Plaintiffs characterize as "secret law."  In particular, Plaintiffs contend that Bates Nos. 2252–66,[5] 2275, and 3730–31 contain "concrete" "guidance" provided to contractors on how OFCCP policy would apply in certain scenarios, and thus they too ought to be disclosed. Dkt. 31-1 at 24.

Those records reflect an email exchange in which Department employees discuss how to respond to an inquiry from a federal "contractor group" about the Religious Exemption Directive.  Specifically, the contractor group wanted to know whether "there are scenarios in

---

[5] The Department also seeks to withhold certain statements in Bates pgs. 2265–66 on the ground that attorney-client privilege applies.  *See* Dkt. 30-4 at 31–32 (*Vaughn* Index).  Plaintiffs do not advance a separate argument challenging the application of the attorney-client privilege to those statements, and, accordingly, the Court will grant summary judgment in favor of the Department with respect to those withholdings.

which religious organizations will be allowed to discriminate based on any of those characteristics, particularly sexual orientation and/or gender identity, outside of the potential byproduct of the traditional ministerial exception (in which the exception is invoked for someone of a different religion who also happens to be female/minority/ gay/etc.)?" Dkt. 31-5 at 65.[6] The Department has redacted portions of the discussions that follow.

Unlike in the records just discussed by the Court, the Department avers that the withheld discussions are predecisional. The *Vaughn* index describes the responses as "preced[ing] the final response" and as "ultimately not [being] adopted because of concerns raised" by another agency employee. Dkt. 30-4 at 29 (*Vaughn* Index). The records themselves support this description, as the email exchange appears to conclude with an employee stating that he is "drafting" the response and "will circulate something" later that day. Dkt. 31-5 at 40. In order for a document to constitute "secret law," it must "represent[] a conclusive or authoritative statement of [the Department's] policy," *Elec. Frontier Found.*, 739 F.3d at 9, or otherwise "embody the agency's effective law and policy," *Sears*, 421 U.S. at 153. Here, that cannot be said of the redacted responses, which the Department attests were not adopted and were predecisional.[7]

---

[6] The Court notes that the question itself was redacted in Bates Nos. 2252–66 and 2275. But because the question was not redacted and instead was released in Bates Nos. 3730–31, the Court sees no reasonably foreseeable harm in its release and grants summary judgment in favor of Plaintiffs regarding that specific passage in these records.

[7] The Department groups these documents in Category I, which Plaintiffs challenge on the ground that the Department has not satisfied its burden to establish reasonably foreseeable harm. The Court considers that challenge below.

5.      *Staff opinions about Department policy*

Finally, Plaintiffs challenge two groups of records that they argue contain "mere internal reactions" to a decision already made by the Department, and thus fall beyond the scope of the deliberative process privilege.  Dkt. 31-1 at 14 (alterations and citation omitted).  Bates Nos. 3268–73 contain an email exchange concerning a "review of [the] reasonable accommodation complaint process," Dkt. 36-2 at 6 (Suppl. Bickerstaffe Decl. at ¶ 18).  In that exchange, the then-Director of the OFCCP states that "the subject of reasonable accommodation is very important to [him]," Dkt. 31-5 at 58, and then further elaborates in a redacted passage.  Plaintiffs contend that the deliberative process privilege is inapplicable because the "record does not relate to any deliberative process" and is "nothing more than a personal refection on the import of reasonable accommodations."  Dkt. 31-1 at 21.  But as the Department explains, the redacted portion "pertain[s] to an idea that OFCCP Director sought to explore with the staff," Dkt. 36-2 at 7 (Suppl. Bickerstaffe Decl. at ¶ 18), regarding the best method for reviewing reasonable accommodation complaints and ensuring that contractors are providing reasonable accommodations when their employees request them," Dkt. 38-2 at 79 (Suppl. *Vaughn* Index).  As such, the passage "is not merely a recitation of old agency policy or an instruction from [the Director] to OFCCP staff regarding how to process reasonable accommodation claims but is actually part of the back-and-forth consultation between staff as OFCCP establishes which projects it wanted to work on within the given year and what steps needed to be taken to effectively addressed an identified issue."  Dkt. 36-2 at 7 (Suppl. Bickerstaffe Decl. ¶ 18).  It therefore falls within the heartland of the deliberative process privilege and is exempt from disclosure.

The second set of records consists of Bates Nos. 2143–44.  Those records contain an email sent from the Director of Enforcement, announcing "two new policy directives focused on ensuring equal employment opportunity and protecting Americans' religious freedom."  Dkt. 31-5 at 10–11.  In response, an Equal Opportunity Response specialist "expressed an opinion about how [the] two new policy directives . . . may impact cases," which the Department redacted. Dkt. 30-4 at 28 (*Vaughn* Index).  The Department maintains that the redacted response is protected by the deliberative process privilege because it "formed a part of [the Department's] discussions regarding implementation and continuation of these sensitive policies."  Dkt. 36-2 at 3 (Suppl. Bickerstaffe Decl. ¶ 10).  At least on the present record, the Court is unpersuaded.

On one hand, the privilege "may extend to internal deliberations over how best to promote or preserve an existing policy in the midst of public debate over whether the government should have such a policy."  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 362. But, on the other hand, "[i]nternal emails seeking and expressing reactions to news articles," or here, press releases, "without an articulated future decision . . . are not properly withheld under the deliberative process privilege.'"  *Gellman v. Dep't of Homeland Sec.*, 613 F. Supp. 3d 124, 149 (D.D.C. 2020).  Here, the unredacted portions of the email suggest that the employee was concerned about the change in policy reflected in the new directive—and, in particular, believed that it was at odds with the goal of protecting covered groups from discrimination—and the Acting Deputy Director of OFCCP sought to explain the shift in policy based on intervening Supreme Court precedents and to assure the employee that the Department remained committed to enforcing the antidiscrimination laws.  Dkt. 31-5 at 10.  Seen in that light, it appears that the employee's email was closer to a "reaction" to a press release than a "recommendation" about how best to preserve or to promote Department's goals or responsibilities.  Nor has the

Department offered an alternative explanation of the employee's purpose in sending the email; the Department has failed to identify, for example, what agency decision remained under consideration at that time. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 101 ("[T]he D.C. Circuit has said that '[t]he failure to specify the relevant final decision constitutes a sufficient ground for remanding [Exemption 5 deliberative process claims] to the district court." (second and third alterations in original) (quoting *Senate of P.R.*, 823 F.2d at 585)).

*    *    *

For these reasons, the Court concludes that the Department has satisfied its burden to show that the deliberative process privilege applies to Bates Nos. 2644–86, 578–86, 593–98, 613–16, 621–55, discussing responses to press inquiries, Bates Nos. 331–36, 1266, 2440, 2586–91, 2071–77, 3703 and 3739, discussing responses to non-profit organizations, Bates Nos. 2252–66, 2275, 3730–31, containing so-called "secret law," and Bates Nos. 3268–73, containing employee "reactions" to OFCCP policy. This, of course, does not mean that the Department can withhold these documents, as it must also satisfy the foreseeable-harm requirement. That will be addressed after the Court considers the applicability of the attorney-client privilege to certain of the Department's withholdings.

On the other hand, the Court grants summary judgment to Plaintiffs as to Bates Nos. 4024–26, discussing responses to press inquiries. With respect to the other contested deliberative process privilege withholdings, however, the Court is left without a sufficient record to grant summary judgment to either party as to the application of FOIA Exemption 5 and will, accordingly, deny the parties' cross-motions for summary judgment as to those records. The Court will allow the Department to provide further context as to the documents as provided below. *See, e.g.*, *Am. Ctr. for L. & Just. v. U.S. Dep't of State*, 330 F. Supp. 3d 293, 304 (D.D.C.

40

2018) (concluding that the court there could not rule on the applicability of the deliberative

process privilege based on the record before it, as the Department had not specified whether the

draft response that immediately preceded an email that stated a response had been delivered was

the final answer that had been provided).

### B.    Attorney-Client Privilege

Exemption 5 also incorporates the attorney-client privilege, which protects "confidential

communications between an attorney and his client relating to a legal matter for which the client

has sought professional advice." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d

242, 252 (D.C. Cir. 1977). "[T]he privilege applies only if [1] the person to whom the

communication was made is 'a member of the bar of a court' who [2] 'in connection with the

communication is acting as a lawyer' and [3] the communication was made 'for the purpose of

securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some

legal proceeding.'" *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 193 (D.D.C. 2013) (quoting

*In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998)). "Attorney-client communications are a

two-way street," *Pub. Emps. for Env't Resp. v. U.S. Env't Prot. Agency*, 211 F. Supp. 3d 227,

233 (D.D.C. 2016), protecting "confidential communications from clients to their attorneys made

for the purpose of securing legal advice" and "communications from attorneys to their clients if

the communications 'rest on confidential information obtained from the client.'" *Tax Analysts*,

117 F.3d at 618 (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)). "[A]

fundamental prerequisite to assertion of the privilege [is] confidentiality both at the time of the

communication and maintained since." *Coastal States Gas Corp.*, 617 F.2d at 863.

As with the other FOIA exemptions, "the burden rests with the [agency] to prove,

through 'detailed and specific information,' that the withheld information falls within the domain

of the privilege." *Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336, 347

(D.D.C. 2018) (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998)).

"In FOIA cases, the agency is typically the 'client' and the agency's lawyers (or lawyers at the

Department of Justice) are typically the 'attorneys' for the purposes of the attorney-client

privilege." *Hall & Assocs. v. U.S. Env't Prot. Agency*, 633 F. Supp. 3d 35, 53 (D.D.C. 2022).

"[W]here an agency lawyer serves in a mixed capacity that includes responsibilities that fall both

within and 'outside the lawyer's sphere,'" however, "that lawyer's advice will be protected only

to the extent that the lawyer offered it in [her] professional, legal capacity." *Citizens for Resp. &*

*Ethics in Wash. v. U.S. Dep't of Justice*, 538 F. Supp. 3d 124, 135 (D.D.C. 2021) (quoting *In re*

*Sealed Case*, 737 F.2d at 99), *aff'd*, 45 F.4th 963 (D.C. Cir. 2022).  To invoke the privilege, the

Department must establish that securing legal advice was a "primary purpose" of the

communication.  *See In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014)

("[T]he test boils down to whether obtaining or providing legal advice was one of the significant

purposes of the attorney-client communication.").

    Here, the Department has invoked the attorney-client privilege to withhold portions of

several records.  As with the deliberative process privilege, the Court groups the records at issue

based on the subject matter of those records, and considers each group in turn.

    1.    *Inquiry from Sen. Lankford: Bates No. 505–23 and Docs No. 116*

    The Department invokes the attorney-client privilege to withhold portions of an email

exchange between OFCCP employees and attorneys within the Department pertaining to an

inquiry OFCCP received from Senator Lankford.  Specifically, the Department asserts the

privilege with respect to "one sentence from Bates No. 505–23 and Docs No. 116, which consists

of an email from an OFCCP employee to two attorneys within CRLM, as well as one sentence

from Bates No. 511, which consists of an internal email between CRLM attorneys initiating their review of the information and inquiry sent by OFCCP personnel."  Dkt. 36-2 at 9 (Suppl. Bickerstaffe Decl. ¶ 25).  Plaintiffs contend that the Department had no basis to redact either sentence pursuant to the privilege.

Beginning with the sentence redacted from Bates No. 511, Plaintiffs contend that this redaction was improper because whatever legal advice it contained is no longer confidential, given that the sentence redacted from Bates No. 511 was previously released, unredacted, to the Plaintiffs in a prior production.  Dkt. 39 at 22; *compare* Dkt. 31-5 at 7, *with* Dkt. 31-4 at 78. "[A] fundamental prerequisite to assertion of the privilege [is] confidentiality both at the time of the communication and maintained since."  *Coastal States Gas Corp.*, 617 F.2d at 863.  Because Plaintiffs are correct that the Department has failed to maintain the confidentiality of the redacted sentence, the Court agrees that the Department may not withhold that sentence pursuant to the attorney-client privilege and, accordingly, grants summary judgment to the Plaintiffs as to that issue.

That leaves a "single sentence" that the Department withheld from these records pursuant to the attorney-client privilege.  Dkt. 36-2 at 9 (Suppl. Bickerstaffe Decl. ¶ 25).[8]  That redacted sentence appears in an email sent from OFCCP staff to two CRLM attorneys "to loop [them] in" to the internal discussion about how to respond to the Senator's inquiry.  Dkt. 31-4 at 72. Because the privilege "protects not only legal advice, but the confidentially conveyed facts upon

---

[8] It is not entirely clear, however, what "single sentence" the Department is referring to in Bates No. 505–23, as multiple portions of those pages have been redacted pursuant to Exemption 5. From the Department's description of the sentence as a communication from "an OFCCP employee to two attorneys within CRLM," the Court infers that the Department is referring to the sentence found for the first time on Bates No. 505, *see* Dkt. 31-4 at 72, and repeated on Bates Nos. 509, 511, 514, 518, 520, 522 and in Doc. No. 116.

which that advice is based," *Pub. Emps. for Env't Resp.'*, 211 F. Supp. 3d at 233; *see also Alexander v. FBI*, 186 F.R.D. 154, 162 (D.D.C. 1999) (explaining that the attorney-client privilege applies not only to legal advice but also to "facts of which the client was informing the attorney for the purpose of securing an opinion of law"), the central question at hand is whether that email was a request for legal advice.

Plaintiffs argue that forwarding an email to two lawyers "to loop [them] in" is not sufficient in and of itself to constitute a request for legal advice but, rather, is "the functional equivalent of an 'FYI.'" Dkt. 31-1 at 29; *see also Cause of Action Inst.*, 330 F. Supp. 3d at 347–48 (finding "the body of [an] email begin[ning] with the acronym 'FYI'" was "a simple alert to another government employee and not a communication whose 'primary purpose' is securing legal advice"). Plaintiffs also point out that the Department failed to offer a declaration attesting that the "primary purpose of the withheld communications was to obtain legal advice from the Civil Rights and Labor Management Division." Dkt. 31-1 at 28.

Plaintiffs' argument proves too much. Although it is true that the D.C. Circuit has embraced the "primary purpose" test for determining what communications are protected by attorney-client privilege, the circuit has made it equally clear that the "primary purpose" test is not a "but-for" inquiry. Rather, the test "boils down to [determining] whether obtaining or providing legal advice was one of the significant purposes of the attorney-client communication." *In re Kellogg Brown & Root, Inc.*, 756 F.3d at 760. Here, the Department's declarations demonstrate that much. After explaining that CRLM does not "depend on formal requests for legal advice in order to facilitate reviews or discussions about legal issue[s]," the Bickerstaffe declaration attests that, upon receiving the redacted email at issue, CRLM "immediately began reviewing the legal issue and the matter was forwarded to [the declarant] for

44

further review, . . . evidenc[ing] the fact that CRLM understood that this was a request for legal advice and that it was initiating a legal review of the information that OFCCP provided to it." Dkt. 36-2 at 10 (Suppl. Bickerstaffe Decl. ¶ 25); *see also* Dkt. 30-4 at 5 (*Vaughn* Index) (describing the process of determining how to respond to Sen. Lankford's inquiry, which "began [with] . . . OFCCP reviewing applicable laws, regulations, and directives and consulting with its legal counsel"). This is sufficient for the Court to conclude that the sentence at issue was properly withheld under the attorney-client privilege.[9]

2.    *Draft document about the Religious Exemption: Bates Nos. 2985–3020*

The Department has also invoked the attorney-client privilege to withhold portions of Bates Nos. 2985–3020. These documents contain "internal communications between CRLM attorneys and OFCCP personnel regarding various documents that OFCCP requested that CRLM review for legal sufficiency and that were prepared by CRLM per OFCCP's request," Dkt. 38-2 at 61 (Suppl. *Vaughn* index), including "a draft document about the religious exemption," Dkt. 30-4 at 43 (*Vaughn* Index). The withheld material contains an email from the director of OFCCP "sent to three CRLM attorneys and one OFCCP employee . . . regarding factors that could be considered when reviewing various documents." Dkt. 36-2 at 10 (Suppl. Bickerstaffe Decl. ¶ 26). Plaintiffs contend that "[t]he email thread indicates that lawyers and non-lawyers alike were editing the draft document, without anyone requesting any legal opinion in the process," and they, accordingly, argue that the attorney-client privilege does not apply to these documents. Dkt. 31-1 at 29–30.

---

[9] The Department redacted the other portions of these records pursuant to the deliberative process privilege, which is discussed above.

But as the Department points out, the CRLM attorneys, after receiving the redacted email from the director of OFCCP, asked OFCCP if they would "like CRLM to take this back and try to address [the director]'s comments."  Dkt. 31-4 at 114.  To which, OFCCP responded, "Yes—Please."  *Id.*  The Department contends that "while not expressly containing a formal request for legal advice," this exchange shows that "OFCCP was seeking legal advice by including CRLM attorneys on the email chain."  Dkt. 36-2 at 10 (Suppl. Bickerstaffe Decl. ¶ 26).  The Court agrees.

First, the Department has explained that the "religious exemption" to Executive Order 11246 was the subject matter of the document the lawyers were editing, which is an inherently legal topic.  Second, the Department has shown, through the responses contained in the documents, that the redacted email contained comments from OFCCP to CRLM about those documents—comments that CRLM was explicitly asked to incorporate.  Under these circumstances, the Court can reasonably infer that the comments were provided to guide CRLM as it provided the legal advice that OFCCP sought—namely, that "CRLM review [the documents] for legal sufficiency," Dkt. 38-2 at 61 (Suppl. *Vaughn* Index).  As such, a "primary purpose" of the redacted comments was to secure legal advice, and the attorney-client privilege therefore applies.  *See Nat'l Sec. Couns.*, 960 F. Supp. 2d at 193 ("The Supreme Court has also clearly recognized that 'the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.'" (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).

3.    *Response to reporter's questions: Bates Nos. 581–86, 593, 621, and 643*

The Department also invokes the attorney-client privilege to withhold portions of an email discussion about how to respond to a Buzzfeed reporter's request for information about

46

cases referred from OFCCP to the Department of Justice.  It states that the withheld communications are "from CRLM, OFCCP's legal counsel, outlining a summary of legal research that would assist OFCCP with responding to an inquiry from Buzzfeed about how many cases OFCCP refers to [the DOJ] and associated data." Dkt. 38-2 at 11 (Suppl. *Vaughn* Index). Plaintiffs argue that because "the primary purpose of these communications was to obtain factual data from CRLM to respond to a reporter's request for that data," these records are unprotected by the attorney-client privilege.  Dkt. 31-1 at 31.

The Department, in turn, responds by clarifying that the "withheld material is not simply reflective of OFCCP data;" "[r]ather, the withheld material consists of legal advice regarding factors OFCCP considers in connection with seeking to disbar a contractor and/or refer cases to DOJ," which "encompasses strategies that OFCCP utilizes in order to ensure compliance with its laws, rules, and regulation[s]."  Dkt. 36-2 at 11 (Suppl. Bickerstaffe Decl. ¶ 27).  In light of this clarification, the Court is persuaded that the materials withheld are protected by the attorney-client privilege.

To be sure, the unredacted portions of the records show that CRLM attorneys were initially asked whether they had "historical data" relevant to the reporter's request.  Dkt. 31-4 at 15.  But subsequent emails inquiring about the nature of the referred cases support the Department's characterization of the redacted materials as containing more than data.  *Id.* at 5. And although Plaintiffs infer that the response was "neutral, objective analyses of agency regulations . . . [that] might be found in an agency manual," *Coastal States Gas Corp.*, 617 F.2d at 863, the Department's description of the redacted materials as relating to the "strategies" that OFCCP pursues in enforcing its regulations, belies that characterization.  Indeed, unlike the memoranda produced by the lawyers in *Coastal States Gas Corp. v. Department of Energy*, 617

F.2d 854 (D.C. Cir. 1980), which resembled "question and answer guidelines which might be found in an agency manual" and that bore "little resemblance to" the way that private parties seek "confidential[]" legal "advice to protect personal interests," *id.* at 863, the Department does not describe the redacted response as merely summarizing an agency policy or as applying that policy to a hypothetical set of facts.  Instead, Bickerstaffe attests that the redacted "material consists of legal advice regarding factors OFCCP considers in connection with seeking to disbar a contractor and/or to refer cases to [the Department of Justice]," including "strategies that OFCCP utilizes in order to ensure compliance with its laws, rules, and regulation[s]."  Dkt. 36-2 at 11 (Suppl. Bickerstaffe Decl. ¶ 27).  The Court thus concludes that the Department permissibly applied the attorney-client privilege to the portions of these documents at issue.

    4.    *Decision to disclose OFCCP data: Bates Nos. 3789–95*

The Department has also withheld portions of Bates Nos. 3789–95 on the ground that the records contain information protected by the attorney-client privilege.  These records contain "internal communication[s] between CRLM attorneys, attorneys within the Solicitor's Office Front Office, and OFCCP personnel regarding factors that OFCCP should consider when determining whether or not it can disclose OFCCP data."  Dkt. 38-2 at 103 (Suppl. *Vaughn* Index).  Specifically, "[t]he withheld information reflects facts provided to [Department of Labor] attorneys that assisted the attorneys with making a determination regarding whether the relevant information could be disclosed" by posting a specific chart on the agency's website.  *Id.*; *see also* Dkt. 31-6 at 20.  Plaintiffs contend that this explanation is insufficient because it fails to explain the attorney's role, and without such an explanation, the Court cannot determine if the attorneys' advice pertained to a legal issue.

Plaintiffs are right on this score: "Where an agency lawyer serves in a mixed capacity that involves responsibilities both within and 'outside the lawyer's sphere,' . . . the agency employee's communications will be protected only to the extent that they involve her professional, legal capacity." *Cause of Action Inst.*, 330 F. Supp. 3d at 347 (quoting *In re Sealed Case*, 737 F.2d at 99). The attorney-client privilege does not extend to a "government attorney's 'advice on political, strategic, or policy issues, valuable as it may [be].'" *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 144–45 (D.D.C. 2013) (alteration in original) (quoting *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998)). Here, the Department has made it clear that lawyers were involved in the decision whether to disclose this information, but it remains unclear whether that decision depended on legal advice. *See Cause of Action Inst.*, 330 F. Supp. at 347 ("The mere fact that the correspondence involved a member of the bar is insufficient" to establish that the material is attorney-client privileged). And the Department's assertion that the redacted materials "reflect internal legal advice provided by attorneys regarding a legal issue that was under review," Dkt. 38-2 at 103 (Suppl. *Vaughn* Index), without more, is too conclusory for the Court to assess whether the privilege applies. *Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 309 (D.D.C. 2013) ("The . . . Department must provide more than the talismanic adjective 'legal' and the conclusory phrase 'attorney client privileged' to establish that a document was sent for the purpose of conveying legal advice.").

5.      *Summary of verbal legal advice: Bates No. 3350*

Finally, the Department has also asserted the attorney-client privilege over portions of Bates No. 3350, which contains a "summary of verbal communication," memorialized in email, between a Deputy Director of the Division of Policy and Program Development and a Department attorney regarding strategy for discussing the talking points during a meeting about

the Religious Exemption Directive.  Dkt. 38-2 at 87 (Suppl. *Vaughn* Index); Dkt. 36-2 at 9

(Suppl. Bickerstaffe Decl. ¶ 23).  The Department explains that the "withheld communication

consists of legal advice from the attorney regarding how best to approach the meeting and

weighed into OFCCP's consideration about how to solicit feedback from employees and present

this important topic." *Id.*

       This description falls short for several reasons.  First, as far as the Court can discern, it

does not appear that an attorney is a party to the communications, and although a recipient of

legal advice can convey that advice to another employee—at least under appropriate

circumstances—without waiving the privilege, neither the *Vaughn* index nor the Bickerstaffe

declaration offers anything more than the conclusory assertion that the email refers to legal

advice about the talking points.  Without more, the Court cannot assess whether the privilege

applies.  Second, it is unclear whether the Department intends to assert the attorney-client

privilege to the redacted talking points and, if so, whether the confidentiality of any advice

reflected in those talking points has been maintained or whether the redacted material was finally

approved and broadly circulated.  Moreover, even if those talking points were only distributed

within the Department, it is not evident that the requisite confidentiality would have been

maintained.  There are some limits, after all, on how broadly information can be shared even

within a client-agency or client-group and still remain confidential.  "The test . . . is whether the

agency is able to demonstrate . . . that the confidential information . . . [was] circulated no further

than among those members 'of the organization who are authorized to speak or act for the

organization in relation to the subject matter of the communication.'"  *Coastal States Gas Corp.*,

617 F.2d at 863.  Here, the Department merely asserts that "[t]he withheld information was only

shared within the Department," at least suggesting that, in the Department's view, Department-

wide communications can qualify as attorney-client communications.  Dkt. 38-2 at 87 (Suppl.

*Vaughn* Index).  Finally, the Department has made no effort to explain why the advice provided

by the Department attorney on the talking points was legal in nature, rather than "advice on

political, strategic, or policy issues."  *Judicial Watch, Inc*, 926 F. Supp. 2d at 144–45 (quoting *In

re Lindsey*, 148 F.3d at 1106).  Attorney-client privilege protects the former, not the latter.

      For these reasons, the Court concludes that the Department has failed to meet its burden

of justifying the application of the attorney-client privilege to Bates No. 3350.[10]

*    *    *

      To summarize, the Court concludes that the Department has yet to meet its burden with

respect to the withholdings in Bates Nos. 3789–95 and 3350.  The Court therefore denies the

parties' cross-motions for summary judgment as to those records.  But the Court also concludes

that the Department has properly applied the attorney-client privilege to most of the records that

Plaintiffs challenge:  the Department had demonstrated that Bates Nos. 505–23, 2985–3020,

581–86, 593, 621, 643 and Doc. No. 116 all contain privileged attorney-client communications.

That does not end the inquiry, though, because Plaintiffs also challenge the Department's efforts

to establish foreseeable harm with respect to these records.

---

[10] Some portions of Bates No. 3350 are also withheld by the Department pursuant to the deliberative process privilege.  Dkt. 36 at 14–16; Dkt. 38-2 at 87 (Suppl. *Vaughn* Index); Dkt. 36-2 at 9 (Suppl. Bickerstaffe Decl. ¶ 23).  Plaintiffs do not challenge the applicability of that privilege, but they do point out that the Department has not explained why release of this record would create a harm that the deliberative process privilege aims to prevent.  Dkt. 31-1 at 27; Dkt. 39 at 26.  Because the Plaintiffs are correct as to that oversight, the Court agrees that the Department has not sustained its burden with respect to the portions of Bates No. 3350 it has withheld pursuant to the deliberative process privilege.

51

C.    **Foreseeable-Harm Requirement**

Having evaluated Plaintiffs' challenges to the Department's application of the

deliberative process and attorney-client privileges, the Court must also consider whether the

Department has established that it "reasonably foresees that disclosure would harm an interest

protected by [the] exemption," 5 U.S.C. § 552(a)(8)(A)(i)(I).  The foreseeable-harm requirement

"impose[s] an independent and meaningful burden on agencies."  *Reps. Comm. for Freedom of

the Press*, 3 F.4th at 369 (quotation marks omitted).  "To satisfy this burden, agencies must do

more than 'rely on mere speculative or abstract fears, . . . [a] fear of embarrassment,' or

'generalized assertions' of harm."  *100Reporters*, 602 F. Supp. 3d at 71 (omission in original)

(quoting *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369).  Instead, agencies must

"specifically and thoughtfully" explain "why disclosure of the particular type of material at issue

will, in the specific context of the agency action at issue, actually impede those same agency

deliberations going forward."  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370, 372.

Agencies can do this by grouping like records together and providing "on a category-by-

category basis . . . the harm that would result from release of each group."  *Id.* at 369.  But "the

basis and likelihood of that harm must be independently demonstrated for each category."  *Id.* "A

'perfunctory state[ment]' that disclosure of all the withheld information—regardless of category

or substance—would jeopardize the free exchange of information between senior leaders within

and outside of the [agency]' will not suffice."  *Id.* at 370 (alterations in original) (quoting

*Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018).

Here, the Department utilized the category-by-category method for addressing the

foreseeable-harm requirement.  The Department "categorized the challenged records into

categories of discrete types of information for the purposes of describing the harm that would

result if the withheld information was disclosed." Dkt. 30-3 at 3–4 (Bickerstaffe Decl. ¶ 7). In Plaintiffs' view, the Department's efforts fail with respect to thirteen of these categories. The Court considers each of the thirteen contested category in turn, starting with the Department's deliberative process privilege withholdings.

        1.     *Deliberative process privilege withholdings*

As explained above, the deliberative process privilege protects from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated" with the goal of "preventing injury to "the quality of agency decisions." *Klamath Water Users Protective Ass'n*, 532 U.S. at 8 (quoting *Sears*, 421 U.S. at 150–51). The rationale for the privilege is straightforward: "[t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front[-]page news." *Id.* at 8–9. And it "guards against 'confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.'" *Reps. Comm. for Freedom of the Press*, 3 F.4th at 361 (quoting *Coastal States Gas Corp.*, 617 F.2d at 866).

To satisfy the foreseeable-harm requirement as it pertains to the deliberative process privilege, therefore, an agency must show that it is reasonably foreseeable that disclosure would cause "injury to the quality of agency decisions." *Sears*, 421 U.S. at 151. But, because "Congress was particularly concerned with increasing agency overuse and abuse of Exemption 5 and the deliberative process privilege," *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369, the foreseeable-harm requirement applies to deliberative process withholdings with "special

force," *100Reporters*, 602 F. Supp. 3d at 61; *see also Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106.

As the analysis set forth below demonstrates, the line between an adequate and inadequate explanation is often a fine one, which can turn on the breadth of the materials grouped together in a single category and a commonsense assessment of when the disclosure of deliberative materials is likely to impede future agency deliberations. That line-drawing process is made more difficult here, moreover, because the Department's explanations are, for the most part, cursory. Some of those explanations are barely sufficient, while others just shy of what is required. Going forward, the Department would substantially aid the process by taking the time to offer more complete explanations of any foreseeable harm.

a.    Category Z

The Court starts with the last category—Category Z—because it is the easiest to resolve. As Plaintiffs point out, the Department identifies no foreseeable harm for these records. In fact, the declaration the Department provides makes no reference to this category at all, despite grouping documents into it in both the original and revised *Vaughn* indices. *See, e.g.*, Dkt. 38-2 at 59. Because the Department fails to make any effort to satisfy its foreseeable-harm burden with respect to these documents, the Court cannot grant summary judgment in favor of the Department for any documents in this category.

That failure might be sufficient for the Court to grant summary judgment to Plaintiffs and to order disclosure of these records. "But in cases 'where [the plaintiff] has not questioned [the agency's] motives and where the matter is not particularly old or otherwise marked with the signs of dilatory behavior,' courts will often afford agencies a 'second chance' to explain their withholdings." *Ams. for Fair Treatment v. U.S. Postal Serv.*, 663 F. Supp. 3d 39, 62 (D.D.C.

2023) (alterations in original) (quoting *S. Alliance for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 79 (D.D.C. 2012)).  Here, the Court sees no such evidence of bad faith by the Department.  And because so many of the contested records—no fewer than 50, *see* Dkt. 31-9— are grouped by the Department into Category Z, the Court assumes it was simply an oversight for the Department to fail to address the issue.  As a result, the Court will grant the Department another opportunity to explain why release of these records would result in foreseeable harm to an interest that Exemption 5 aims to protect.  But the Department is cautioned to take more care with its next submission.

      b.   <u>Category H</u>

Category H "consists of OFCCP's internal deliberation[s] regarding the content of the [Religious Freedom] Directive . . . , as well as deliberation[s] regarding, and initial drafts of, frequently asked questions (FAQs) that OFCCP was considering issuing that would accompany the Directive as further guidance."  Dkt. 30-3 at 6 (Bickerstaffe Decl. ¶ 7h).  The Department asserts that "[d]isclosure of this information would foreseeably harm OFCCP by chilling necessary collaboration within the agency and with its counsel to ensure that all issues related to the Directive and guidance were discussed, evaluated, and that the final published guidance on the topic was accurate, defensible, and helpful to the federal contractors over which OFCCP has jurisdiction."  *Id.*  Plaintiffs contend that this articulation of foreseeable harm is fundamentally flawed.  They point out that the Religious Freedom Directive and its accompanying guidance have been rescinded, *see* Dkt. 31-1 at 35, and as result, "[the] only averment of 'harm' is entirely backward-looking," *id.* at 36.

In considering whether an agency has satisfied the foreseeable-harm requirement, courts look to the future harm that could result if the withheld documents were released.  As the D.C.

Circuit explained in *Reporters Committee for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C.

Cir. 2021), an agency must provide "a focused and concrete demonstration of why disclosure of

the particular type of material at issue will . . . actually impede those same agency deliberations

*going forward*," *id.* at 370 (emphasis added); *accord Machado Amadis v. U.S. Dep't of State*,

971 F.3d 364, 371 (D.C. Cir. 2020) (finding sufficient an agency's articulation of foreseeable

harm that "focused on 'the information at issue' in the [redacted materials], and . . . conclus[ion]

that disclosure of that information 'would' chill future internal discussions.").  The need to

identify some harm—*going forward*—moreover, is consistent with the text of the statute, which

provides the agency shall "withhold information . . . only if [it] reasonably *foresees* that

disclosure would harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8)(A)(i)(I)

(emphasis added).  In ordinary parlance, to "foresee" something means "to see beforehand, have

prescience of."  Foresee, *Oxford English Dictionary Online* (Sept. 2023).  One, then, cannot

foresee consequences that have already occurred.

      Here, the Department's proffer of foreseeable harm is baffling; it argues that release of

the documents will "chill[] necessary collaboration" that has already occurred—namely, "that all

issues related to the Directive and guidance *were* discussed, evaluated, and that the final

published guidance on the topic *was* accurate, defensible, and helpful."  Dkt. 30-3 at 6

(Bickerstaffe Decl. ¶ 7h) (emphasis added).  Perhaps the Department intends to suggest that

disclosure of the deliberative materials would impair a similar deliberative process in the future,

but that it is not what it says.  *See Nat'l Sec. Archive*, 752 F.3d at 464 ("[R]elease of material

protected by the deliberative process privilege would have the effect of chilling current and

future agency decision[-]making because agency officials—realizing that the privilege

evaporates over time—would no longer have the assurance that their communications would

remain protected.  And without that assurance, they in turn would not feel as free to advance the

frank and candid ideas and advice that help agencies make good decisions.").  Nor has the

Department offered a meaningful response to Plaintiffs' specific contentions relating to Category

H.  The Court, accordingly, concludes that the Department has failed to explain "why disclosure

of the particular type of material at issue will . . . actually impede those same agency

deliberations going forward," *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370.  The Court

will, however, give the Department one more chance to meet its burden.

c.  <u>Communications from former OFCCP leadership</u>

In a related argument, Plaintiffs challenge the Department's showing of foreseeable harm

with respect to the communications involving the former OFCCP Director and Deputy Director

about the Religious Exemption Directive and associated rulemaking.[11]  Plaintiffs argue that

because "several key individuals responsible for the decisions regarding the Proposed Rule have

since left the agency," there is "no opportunity for their communications to be chilled" in the

future.  Dkt. 31-1 at 37.  As a result, Plaintiffs suggest that the foreseeable harm articulated by

the Department is insufficient.

But Plaintiffs' argument misapprehends the Department's foreseeable-harm justification.

The Department does not base its claim of foreseeable harm on the risk of chilling these

particular officials in future deliberations.  Rather, it focuses more generally on the risk of

chilling future deliberations between managers and others in OFCCP.  *See*, *e.g.*, Dkt. 30-3 at 9–

10 (Bickerstaffe Decl. ¶¶ 7p–q).  The Department's claim of foreseeable harm for all of the

categories implicated by this challenge can be summed up as follows: these documents were part

---

[11] These records are Bates Nos. 2272 (Category I), 2644–86 (Category I), 3268–73 (Category C), 3276 (Category C), 3297 (Category C), 3309–22 (Category C), 3993–98 (Category I), 4001–06 (Category I), 578–93 (Category Q), and 3703 (Category I).

of a decision-making process; the release of predecisional documents involved in that process would undermine effectiveness of that decision-making process in the future because participants in that process would know that their predecisional remarks could be shared with the public and would not be as candid in that decision-making process. *See generally*, Dkt. 30-3 (Bickerstaffe Decl.). This logic stands even if the people whose remarks are being shared are not the same people who will be involved in the decision-making process in the future. As the D.C. Circuit has explained:

> [I]n order for a privilege to encourage frank and candid debate, the speaker or writer must have some strong assurance at the time of the communication that the communication will remain confidential. Premature release of material protected by the deliberative process privilege would have the effect of chilling current and future agency decision[-]making because agency officials—realizing that the privilege evaporates over time—would no longer have the assurance that their communications would remain protected. And without that assurance, they in turn would not feel as free to advance the frank and candid ideas and advice that help agencies make good decisions.

*Nat'l Sec. Archive*, 752 F.3d at 464.

That said, some of the explanations that the Department has offered with respect to documents in these categories lack sufficient detail to pass muster; an agency is required to explain in a "focused and concrete" manner how the disclosure of the records at issue will "actually impede" future agency deliberations. *Reporters Comm.*, 3 F.4th at 370. The Court discusses these deficiencies in the category-specific analyses below.

       d.   <u>Categories A & E</u>

Plaintiffs also challenge the sufficiency of the harm the Department has identified for Category A. Category A "consists of information shared with OFCCP through the [Department of Labor] interagency clearance process by [the Department's] Office of Legal Counsel." Dkt. 30-3 at 4 (Bickerstaffe Decl. ¶ 7a). These materials included "summaries of draft legislation and

Congressional Questions for the Record (QFRs), as well as OFCCP's initial drafts of feedback in response to one of these clearance items regarding the proposed Equality Act." *Id.* The Department withheld from release "deliberations within the Department regarding which portions of the clearance items may impact agencies within DOL, the extent of that impact, and non-final agency suggestions for proposed changes to the clearance items." *Id.* It argues that "[d]isclosure of this information would foreseeably harm [the Office of Legal Counsel's] ability to provide necessary context to [the Department of Labor] agencies to facilitate the clearance process, and would foreseeably harm [the Department of Labor] generally by chilling candid written deliberations about the issues raised by clearance items, thus preventing carefully considered and accurate feedback in response." *Id.*

Plaintiffs contend this rationale is a "mere[] . . . restate[ment] [of] the generic rationale for the entire privilege." Dkt. 31-1 at 41 (quoting *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 116 (D.D.C. 2021)). Although a close question, the Court is persuaded that, in this particular instance, the Department's explanation suffices. The Department has identified "the particular type of material at issue," *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370—here, feedback from subject matter experts within the agency on draft legislation and QFRs. And it has explained why disclosure of those materials would "actually impede those same agency deliberations going forward," *id.*—by explaining that if these deliberations were to be disclosed, Office of Legal Counsel employees, when sending the records to the subject matter experts, would provide less fulsome context, and that, in turn, the subject matter experts, after receiving those materials, would provide less "considered and accurate feedback."

The Department offers a similar explanation with respect to records in Category E. That category "consists of deliberations regarding how to respond to Questions for the Record (QFRs) sent by Congress to Secretary Acosta that pertained to OFCCP, and initial draft responses by OFCCP to those QFRs." Dkt. 30-3 at 5 (Bickerstaffe Decl. ¶ 7e). The Department states that "[r]equiring disclosure of the deliberation regarding these responses would . . . chill[] [the Department's] ability to communicate regarding how best to respond to inquiries from Congress." *Id.* And, the Department adds, "disclosure of initial drafts of QFRs, before they have been reviewed and revised by Departmental leadership, would stymie [the Department's] process for delegating draft responses to various agencies, resulting in a more cumbersome process and likely resulting in less comprehensive and accurate responses to Congress." *Id.* Once again, although a close question, the Court is persuaded that the Department has done more than parroted back the general justification for the privilege; rather, it has explained why disclosure of these specific materials (draft responses to QFRs) would be harmful to the agency's decision-making process going forward (because the agency would not delegate draft responses to agencies outside of Department leadership). This description of foreseeable harm is therefore adequate.

      e.  <u>Categories B & C</u>

Category C contains "OFCCP and CRLM deliberation[s] regarding the appropriate standard of review for assessing compliance with religious accommodation protections under Executive Order 11246 and the Americans with Disabilities Act, . . . and deliberation[s] over the ways in which OFCCP could assess contractor compliance." Dkt. 30-3 at 4–5 (Bickerstaffe Decl. ¶ 7c). The Department maintains that foreseeable harm would result from disclosure of these records because it would "chill[] candid written deliberation via email regarding how to

properly evaluate religious accommodation claims within the context of OFCCP's compliance evaluation process." *Id.* at 5 (Bickerstaffe Decl. ¶ 7c). This, the Department argues, would "result[] in less accurate and potentially confusing information ultimately being disseminated to complainants who have filed such claims with the OFCCP." *Id.*

Plaintiffs argue that the Department needs to do more to explain why the identified harm, the dissemination of "less accurate and potentially confusing information" to complainants, Dkt. 31-1 at 39, would result from "disclosure of these specific records," individually, *id.* The Court disagrees. "[A]gencies may . . . satisfy [their] burden on a category-by-category basis"—"that is, group together like records and explain the harm that would result from the release of each group." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (internal quotation marks and citation omitted). Here, the Department has explained that disclosure of "deliberation over the ways in which OFCCP could assess contractor compliance" would "chill[] candid written deliberation" about that topic in the future. The result, the Department maintains, is that its ability to assess compliance would be hindered such that complainants may receive "less accurate and potentially confusing information" on that topic. Dkt. 30-3 at 4–5 (Bickerstaffe Decl. ¶ 7c). That is sufficient for these purposes.

Category B contains "OFCCP's deliberation[s] in response to questions raised about the scope and applicability of Executive Order 13777, Enforcing the Regulatory Reform Agency, to OFCCP regulations and proposed regulations." *Id.* at 4 (Bickerstaffe Decl. ¶ 7b). As with Category C, the Department explains that disclosure would cause foreseeable harm because it would "chill[] candid written deliberation via email," this time "regarding how to comply with issued Executive Orders." *Id.* While the Department's explanation with respect to Category C (barely) passes muster, this explanation does not. The reference to future discussions about how

to comply with "issued Executive Orders" is simply too conclusory and boilerplate to satisfy the Department's burden.  It is akin to saying, disclosure would chill future discussions about how to comply with statutes or regulations.  More is needed to establish a "link between the specified harm"—chilled deliberations—"and specific information contained in the material withheld"— how OFCCP should comply with this specific executive order and other executive orders generally.  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (quotation marks and citations omitted); *see also Cause of Action Inst. v. U.S. Dep't of Veterans Affs.*, No. 20-997, 2021 WL 1549668, at *15 (D.D.C. Apr. 20, 2021) (explaining that in *Machado Amadis*, the D.C. Circuit found it sufficient when the "agency 'specifically focused on the information at issue' and properly 'concluded that disclosure of that information would chill future internal discussions.'" (quoting *Machado Amadis*, 971 F.3d at 371)).  Again, the Court will provide the Department with another opportunity to articulate a sufficient detailed foreseeable harm.

      f.   <u>Category Q</u>

Category Q "consists of:"

> [I]nternal deliberations within the agency and with legal counsel regarding an inquiry from a media organization into instances in which OFCCP has, or has considered, referring a case under investigation to the Department of Justice (DOJ) for litigation.  The withheld information included internal deliberations within OFCCP about how best to respond to this inquiry, as well as consultation with OFCCP's legal counsel regarding the situations in which OFCCP has in the past and could in the future consider referring a case to DOJ.

Dkt. 30-3 at 9 (Bickerstaffe Decl. ¶ 7q).  The Department contends that "[d]isclosure of this information would foreseeably harm OFCCP by releasing to the public internal deliberations about the strategic considerations OFCCP takes into account in determining whether to refer a case to [the Department of Justice] rather than seeking enforcement before the [Department of Labor] Office of Administrative Law Judges."  *Id.* at 9–10 (Bickerstaffe Decl. ¶ 7q).

Plaintiffs contend that this is insufficient because the Department has not "identif[ied] specific harms . . . that . . . would actually ensue from disclosure" and has not "connect[ed] the harms in a meaningful way to the information withheld."  Dkt. 31-1 at 40.  The next few sentences in the Department's declaration, however, do exactly that.  The Department goes on to explain that "some of the information withheld includes specifics about previous attempts to refer cases to [the Department of Justice]" and "[a]s such, release of this information could negatively impact OFCCP's enforcement efforts going forward."  Dkt. 30-3 at 10 (Bickerstaffe Decl. ¶ 7q).  Because the Department has "explain[ed] the particular sensitivity of the types of information at issue [and] the role that they play in the relevant agency decisional processes," the Court concludes this description of foreseeable harm sufficient.  *Reps. Comm. for Freedom of the Press*, 3 F.4th at 372.

> g.    Categories J, K & I

Categories J, K, and I all contain documents that reflect discussions within the Department about how to interact with the public about the Directive and Religious Exemption. Category J "consists of OFCCP deliberation regarding the contents of an Information Collection Request (ICR) that was in draft form and that the agency was working to finalize for submission to the Office of Management and Budget."  Dkt. 30-3 at 7 (Bickerstaffe Decl. ¶ 7j).  The Department asserts that the "withheld information include[s] staff recommendations to OFFCP managers regarding how to address issues related to confidentiality in the ICR document," and maintains that disclosing this information would cause foreseeable harm to OFCCP by "chilling written deliberation[s] and opinions from staff to management regarding the contents of an ICR." *Id.*  Such chilling would result in a "more cumbersome review process," leading to "OFCCP submitting less comprehensive and clear ICRs for public comment, which would give rise to

more confusion in the regulated community."  *Id.*  Similarly, Category K "consists of the agency's internal deliberation[s] regarding, and draft responses to, correspondence and emails from Senator Lankford and members of his staff to OFCCP regarding the scope of the religious exemption in Executive Order 11246 in light of a 2017 [Department of Justice] Memorandum on religious liberty, the [Religious Freedom] Directive, and rulemaking related to the religious exemption."  Dkt. 30-3 at 7 (Bickerstaffe Decl. ¶ 7k).  The Department contends that "[d]isclosure of this information would foreseeably harm OFCCP by chilling its ability to share initial draft responses for comment and to engage in written deliberation among staff regarding responses to Congressional correspondence, thus making it more difficult for OFCCP to respond to such correspondence in a timely and accurate manner."  *Id.*  Plaintiffs contend that this is insufficient because the Department "says nothing about why these particular drafts, in light of their particular content, warrant withholding."  Dkt. 31-1 at 38.  The Court concludes that the Department's explanations for Categories J and K suffice.

Although the Department's assertions of foreseeable harm must be "particular" to the documents at issue, *see Rosenberg*, 342 F. Supp. 3d. at 78, the Department does not need to provide a document-by-document explanation for the harm it anticipates will result from each document's release.  Rather, all the Department must do is "provide context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure."  *Cause of Action Inst.*, 2021 WL 1549668, at *15.  The Department has done as much here:  For Category J, it has explained that the specific decision-making process regarding confidentiality in an ICR document would be made more difficult by requiring public disclosure, resulting in less comprehensive ICRs and "confusion" in the regulated community.  In addition, for Category K, it has explained that a specific decision-making process, regarding

how to respond to congressional inquiries, would be hampered in a particular manner, by chilling the sharing of draft responses to congressional inquiries and by "making it more difficult for OFCCP to respond to [those] requests in a timely and accurate manner."  The Department has done enough (although just barely enough) to satisfy its burden with respect to these categories of documents.

Category I includes "agency deliberations regarding how to address various questions that came into the Department from news media and contractor representatives regarding the Religious Exemption Directive after the Directive was published."  Dkt. 30-3 at 6 (Bickerstaffe Decl. ¶ 7i).  These deliberations included "initial and deliberative thoughts on whether to respond to the inquiries, what the form and content of any response to such inquiries should be, deliberations about how language in the Directive should be interpreted, and communications with the legal servicing division regarding these topics."  *Id.*  According to the Department, if these deliberations were to be disclosed, its "ability to deliberate in writing regarding questions raised by the public about published guidance" would be "chill[ed]," which would "result[] in a more cumbersome process for addressing such questions that would give rise to less complete, accurate, and robust responses to stakeholders seeking clarification about published Directives."  *Id.* at 6–7 (Bickerstaffe Decl. ¶ 7i).  Although the Department's explanation with respect to Category K just barely suffices, this explanation falls short.  As explained above, the Department may address foreseeable harm for discrete categories of records, where the rationale does not differ from document to document.  Here, however, the Department treats all public inquiries regarding published guidance as a single category, including inquiries from "contractor representatives."  It fails, moreover, to explain why a public inquiry about published guidance would differ in material respects from an inquiry about Department regulations or policies.  As a

result, the explanation would seem to apply to an undifferentiated array of public inquiries,

merely observing that disclosure would make it "more cumbersome" to respond to public

inquiries in the future.  The Department, accordingly, has failed to offer an explanation that

"connect[s] the harms in a[] meaningful way to the [specific] information withheld."  *Jud.*

*Watch, Inc. v. U.S. Dep't of Just.*, No. 17-0832, 2019 WL 4644029, *5 (D.D.C. Sept. 24, 2019).

       h.   <u>Category V</u>

      Plaintiffs also challenge Category V.  Category V "consists of internal deliberations

within the agency regarding the content of 'rollout materials,'" such as "fact sheets, talking

points, press releases, FAQs," "that were published contemporaneously with the publication of

the Religious Exemption Notice of Proposed Rulemaking."  Dkt. 30-3 at 11 (Bickerstaffe Decl.

¶ 7v).  The Department explains that "[d]isclosure of these non-final draft documents would

foreseeably harm OFCCP by chilling the candid and robust interagency review process within

[the Department] that takes place prior to the issuance of rollout materials, resulting in a less

efficient process and rollout materials that are less comprehensive, accurate, and helpful to the

public."  *Id.* at 12 (Bickerstaffe Decl. ¶ 7v).  This explanation (barely) suffices.  The explanation

is focused on a specific class of agency records—"fact sheets, talking points, press releases,

FAQs, and other internal documents [used] to assist with responding to any questions that may

come in from stakeholders or media organizations" when a new policy is announced—and it

identifies a specific harm to the deliberative process—"chilling the candid and robust

interagency review process within [the Department] that takes place prior to issuance of rollout

materials," thereby impeding the preparation of the most comprehensive, accurate and helpful

"rollout materials."

       i.   <u>Categories P and G</u>

Plaintiffs also challenge, in a passing manner, the foreseeable harm the Department articulates for several specific documents in Categories P and G.[12]  Plaintiffs contend that the justification the Department provided for these categories is "boilerplate" and therefore insufficient.  Dkt. 31-1 at 44–45.

Category P consists of "written communications from OFCCP Compliance Officers to OFCCP managers, and manager responses, regarding the Religious Exemption Directive soon after its issuance, including questions regarding whether the Religious Exemption Directive would have any impact on a complaint investigation that was in progress."  Dkt. 30-3 at 9 (Bickerstaffe Decl. ¶ 7p).  The Department explains that disclosure of these materials would "chill[] OFCCP Compliance Officers . . . from asking questions of OFCCP managers about the impact of newly issued guidance on their investigations, and in turn prevent managers from requesting more information in order to provide accurate guidance in response to these questions."  *Id.*  This explanation (barely) suffices.  Albeit cursory, it offers a specific explanation of why harm would foreseeably result from the disclosure of these materials in a particular circumstance.  The fact that the explanation focuses on inquiries by compliance officers, who will be responsible for implementing the new policy and conducting investigations, moreover, adds an element of commonsense to the Department's assessment of foreseeable harm.

Category G consists of internal deliberations about how the Religious Exemption Directives would be implemented, specifically relating to "correspondence from the National

---

[12] Plaintiffs also reference specific documents in Categories B and I.  Those documents are addressed above.

Center for Transgender Equality raising several questions regarding the scope and proper interpretation of the Religious Exemption Directive." *Id.* at 6 (Bickerstaffe Decl. ¶ 7g). The Department explains that release of these records would "foreseeably harm OFCCP by chilling their ability to deliberate in writing and disseminate draft correspondence for comment, thus resulting in a more cumbersome process and less complete, accurate, and robust responses to stakeholders seeking clarification about published Directives." *Id.* Given the narrow scope of this category and focused nature of the Department's assessment—and, in particular, its focus on draft responses that had not yet received legal or policy review and that addressed a contentious topic—the Court concludes the explanation suffices.

*   *   *

In sum, the Court concludes that the Department has satisfied its burden, for all the described categories, except Categories B, H, I, and Z, of showing that foreseeable harm would result from the disclosure of the materials it has withheld pursuant to the deliberative process privilege.

### 2.    *Attorney-client privilege withholdings*

When Congress enacted the foreseeable-harm requirement in 2016, it was particularly concerned about the government's extensive use of the deliberative process privilege to withhold documents. *See Reps. Comm. for Freedom of the Press*, 3 F.4th at 369. Consistent with this focus, much of the caselaw interpreting the requirement has addressed how the requirement applies to deliberative-process withholdings. *See e.g.*, *id.*; *see also Machado Amadis*, 971 F.3d at 371. But the foreseeable-harm requirement was not drafted so narrowly; it applies to all withholdings, except those mandated by law. 5 U.S.C. § 552(a)(8)(A)(i) ("An agency shall (i) withhold information under this section only if (I) the agency reasonably foresees that disclosure

68

would harm an interest protected by an exemption described in [§ 552(b)]; or (II) disclosure is
prohibited by law.").

Given the lack of precedent applying the requirement to attorney-client withholdings, *see*
*Wilderness Workshop v. U.S. Dep't of Agric.*, No. 21-2108, 2023 WL 5672578, at *9 (D.D.C.
Sept. 1, 2023) ("Although the D.C. Circuit has expounded upon the relationship between the
foreseeable harm requirement and the deliberative process privilege, the relationship between
foreseeable harm and the attorney-client and work-product privileges remains largely
undefined"), the Court begins its analysis by considering what burden the foreseeable-harm
requirement imposes on agencies in the attorney-client-privilege context.

    a.  <u>Applicable standard</u>

The foreseeable-harm requirement was introduced to FOIA in 2016.  Congress enacted
the requirement "in part out of concerns that some agencies [were] overusing FOIA exemptions
that allow, but do not require, information to be withheld from disclosure."  *Reps. Comm. for*
*Freedom of the Press*, 3 F.4th at 369 (internal quotation marks and citation omitted).  The
foreseeable-harm requirement Congress adopted, however, was not totally new.

In 2009, President Barack Obama issued a directive to executive branch agencies,
instructing them to administer FOIA "with a clear presumption:  In the face of doubt, openness
prevails."  Memorandum on the Freedom of Information Act, 74 Fed. Reg. 4683, 4683 (Jan. 21,
2009).  That general "presumption" was put into practice by then-Attorney General Eric Holder,
who, in a memorandum to executive branch agencies, stated that "an agency should not withhold
information simply because it may do so legally" or "merely because it can demonstrate, as a
technical matter, that the records fall within the scope of a FOIA exemption."  Memorandum
from Eric Holder, Attorney Gen., U.S. Dep't of Just. (Mar. 19, 2009),

https://www.justice.gov/sites/default/files/ag/legacy/2009/06/24/foia-memo-march2009.pdf.

Rather, the Department of Justice would now "defend a denial of a FOIA request only if (1) the

agency reasonably fores[aw] that disclosure would harm an interest protected by one of [FOIA's]

statutory exemptions, or (2) disclosure [was] prohibited by law."  *Id.*

Sharing the "concern[] that some agencies [were] overusing FOIA exemptions that

allow[ed], but d[id] not require, information to be withheld from disclosure," S. Rep. No. 114-4,

at 3 (2015), as reprinted in 2016 U.S.C.C.A.N. 321, 323, Congress enacted the foreseeable harm

requirement into law six years later in the FOIA Improvement Act.  The House Report

highlighted the "growing and troubling trend towards [agencies] relying on the[] discretionary

[FOIA] exemptions to withhold large swaths of Government information, even though no harm

would result from disclosure," and it observed, by way of example, that "Federal agencies used

Exemption 5, which permits nondisclosure of information covered by litigation privileges such

as the attorney-client privilege, the attorney work product doctrine, and the deliberative process

privilege, more than 79,000 times in 2012—a 41% increase from the previous year."  *Id.*

Although the deliberative process privilege was "the source of the most concern regarding

overuse," the concern about overapplication of FOIA exemptions encompassed Exemption 5 as a

whole.  H.R. Rep. No. 114-391, at 10 (2016) ("Exemption five has been singled out as a

particularly problematic exemption.  Some have taken to calling it the 'withhold it because you

want to' exemption. . . . Federal agencies most commonly invoke exemption five to withhold

records protected by attorney client privilege, attorney work product privilege, and the

deliberative process privilege.").

Congress, accordingly, sought to "[b]uild[] on the Administration's efforts" by

"codify[ing] the presumption," thereby "making it a permanent requirement for agencies."  *Id.* at

70

9.  To withhold records pursuant to the "discretionary exemptions, such as exemption two or exemption five, which cover internal personnel policy and legal privileges, respectively," an agency would have to articulate "a specific, identifiable harm that would be caused by a disclosure." *Id.* Or, more specifically, to satisfy the foreseeable-harm requirement, agencies would now be required to "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Id.* As enacted in the FOIA Improvement Act, the foreseeable-harm requirement thus provides that "[a]n agency shall (i) withhold information under this section only if (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . or (II) disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i).

The D.C. Circuit has read this statutory language to "foreclose the withholding of material unless the agency can 'articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld.'" *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (citation omitted). Although an agency can satisfy that burden by "'group[ing] together like records' and explain[ing] the harm that would result from release of each group," "the basis and likelihood of that harm must be independently demonstrated for each category" and "mere 'speculative or abstract fears,'" or "generalized assertions" are insufficient. *Id.* (first quoting S. Rep. No. 4, at 8, then *Machado Amadis*, 971 F.3d at 371).

In the context of the deliberative process privilege, this standard has been interpreted to require more of an agency that an "umbrella paragraph" providing a "wholly generalized and conclusory" articulation of foreseeable harm that amounts to no more than "the generic rationale for the . . . privilege itself." *Id.* at 370. Consistent with that principle, decisions from this Court

71

have rejected explanations of harm that are "not connected . . . in any meaningful way to the

information withheld, such as by providing context or insight into the specific decision-making

processes or deliberations at issue, and how they in particular would be harmed by disclosure."

*Jud. Watch, Inc.*, 2019 WL 4644029, at *5; *see also, e.g.*, *Jud. Watch, Inc. v. U.S. Dep't of Com.*,

375 F. Supp. 3d 93, 100 (D.D.C. 2019) ("These general explanations of the possibility of a

chilling effect fall short of articulating a link between the specified harm and specific

information contained in the material withheld.") (internal quotation marks and citation omitted);

*Reps. Comm. for Freedom of the Press*, 567 F. Supp. 3d at 115 ("CBP[] merely restates those

broad justifications for the privilege.  The harm that CBP identifies—the risk that agency

officials might not seek guidance or share their views—undergirds the privilege in every case.");

*Rosenberg*, 342 F. Supp. 3d at 79 ("[T]he court agrees with Plaintiffs that the government must

do more than perfunctorily state that disclosure of all the withheld information—regardless of

category or substance—would jeopardize the free exchange of information between senior

leaders within and outside of the [agency].").

      These decisions, however, apply this standard to deliberative-process withholdings, not to

attorney-client withholdings.  And decisions from this Court have also indicated that the rigor

with which the foreseeable-harm requirement is applied "may shift depending on the nature of

the interests protected by the specific exemption with respect to which a claim of foreseeable

harm is made."  *Cause of Action Inst.*, 2021 WL 1549668, at *15.  Citing to the "prominent and

sacrosanct nature of the attorney-client relationship," this Court has observed that "an agency

may not need to provide as much information to satisfy the foreseeable harm requirement" as it

must provide in the context of the deliberative process privilege.  *Wilderness Workshop*, 2023

WL 5672578, at *9 (internal quotation marks and citation omitted); *see also Reps. Comm. for*

72

*Freedom of the Press*, 567 F. Supp. 3d at 120 ("[A]n agency's burden under the foreseeable

harm requirement may be more easily met when invoking other privileges and exemptions for

which the risk of harm through disclosure is more self-evident and the potential for agency

overuse is attenuated."); *Am. First Legal Found. v. U.S. Dep't of Agric.*, No. 22-3029, 2023 WL

4581313, at *8 (D.D.C. July 18, 2023) ("The purpose of the attorney-client privilege

encompassed by Exemption 5, for example, is to provide an assurance of confidentiality to

clients, such that disclosure of privileged information is a harm in and of itself.  When invoking

the attorney-client privilege, then, an agency likely does not need to reach far beyond the fact of

disclosure to show foreseeable harm.") (internal quotation marks and citation omitted).  But it is

equally clear that merely establishing that the agency has properly asserted the attorney-client

privilege will not, standing alone, satisfy the foreseeable-harm requirement.  If that were so, the

requirement would not "impose[] an independent and meaningful burden on agencies."  *Reps.*

*Comm. for Freedom of the Press*, 3 F.4th at 369 (quoting *Ctr. for Investigative Reporting*, 436 F.

Supp. 3d at 106); *cf. Americans for Fair Treatment v. U.S. Postal Serv.*, No. 22-1183, 2023 WL

2610861, *13 (D.D.C. March 23, 2023) ("If stating simply that a draft version 'differ[s] from the

final version' of a policy or statement" such that release could cause "public confusion" "were

enough to show reasonably foreseeable harm, agencies would never need to provide a situation-

specific reason for withholding a nonfinal draft.") (quoting *Pub. Emps. for Env't Resp. v. Dep't*

*of Homeland Sec.*, 575 F. Supp. 3d 34, 51 (D.D.C. 2021)).

So, although "establishing [that] the privilege applies 'will [often] go a long way' toward

satisfying [the agency's foreseeable-harm] burden," more is required to satisfy the statutory

standard.  *Wilderness Workshop*, 2023 WL 5672578, at *9 (quoting *Reps. Comm. for Freedom of*

*the Press*, 567 F. Supp. 3d at 124).  At times, "[t]he very context and purpose of [a]

communication[] bearing on sensitive" legal matters might adequately support a claim of foreseeable harm. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 372 ("[T]he sensitivity of the context in which these conversations arose as well as their subject matter, and the need for confidentiality in discussions of undercover tactics, together provide the particularized context for a finding of foreseeable harm as to both sets of emails."). At other times, however, a more detailed explanation will be required. Ultimately, the Court must be guided by the statutory text, commonsense, and the record as a whole, and must assess whether the agency has explained "both the nature of the harm [that would result from release] and the link between the specified harm and specific information contained in the material withheld," regardless of whether the agency is relying on the deliberative process privilege or attorney-client privilege under Exemption 5. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369; *see also, e.g.*, *Sea Shepard v. Nat'l Oceanic & Atmospheric Admin.*, 516 F. Supp. 3d 1217, 1241 (D.D.C. 2021) ("The same holds true for information withheld under the attorney-client privilege. The Government describes the contents of what is withheld and explains that release would discourage the open and frank communication between counsel and client in NOAA's administration of the APA and the MMPA, including preparation for litigation.") (internal quotation marks omitted).

      b.   <u>The Department's explanation of foreseeable harm</u>

      Applying that standard here, the Court concludes that the Department has failed to do enough to establish a "link between the specified harm and [the] specific information contained in the material withheld." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (quotation marks and citations omitted). To start, the Department groups together all legal advice, regardless of whether it addressed the implementation of the Religious Exemption Directive, "legal issues associated with inquiries from the public [or] Congress," and the wording of

"various [unidentified] documents," or the Department's "authority to engage in certain [unidentified] action[]."  Dkt. 30-3 at 14 (Bickerstaffe Decl. ¶ 11).  That is open-ended enough, but to make matters worse, the Department adds that this list represents "just . . . a few [of the] topics discussed" in the attorney-client communications.  *Id.*  As a result, the reader is left to guess about the nature of at least some—and perhaps many—of the communications at issue.

Not only is the subject-matter ill-defined, the Department also offers little context regarding the recipients.  It merely asserts the materials were "only shared internally to assist various [Department of Labor] employees with making decisions about how to move forward with various issues."  *Id.* (Bickerstaffe Decl. ¶ 12).  The Court might fill some of these holes by going back to the *Vaughn* index and reviewing the subject matter and the recipients of each assertedly privileged communication.  But it is the Department's burden to establish foreseeable harm based on the specific information contained in the specific communications, and it is not the Court's role to connect those dots for the agency.  Nor could the Court do so; it cannot discern, for example, who may have been shown (or had access to) the communications at issue.

Even putting these difficulties aside, moreover, the Department's remaining efforts to demonstrate foreseeable harm fall short.  It asserts that "[r]eleasing these communications would undermine OFCCP's ability to utilize its legal counsel for assistance in resolving complex problems if such information was *routinely* disclosed to the public."  *Id.* (emphasis added).  That assertion is, of course, boilerplate:  it could be offered in support of any assertion of the attorney-client privilege.  But it is worse than that.  It appears to acknowledge that an occasional disclosure—one that is not "routine"—might pose no risk at all.  And it is undeniably the case that agencies, at times, do release advice rendered within the Executive Branch without damaging consequences.  *See*, *e.g.*, *Citizens for Resp.  & Ethics in Washington v. U.S. Dep't of*

*Just.*, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (noting that the U.S. Department of Justice, Office of Legal Counsel "has a longstanding internal process in place for regular consideration of whether to share significant opinions with the public") (internal quotation marks and citation omitted). Here, however, the Court cannot assess, based on the Department's sweeping and conclusory declaration, whether disclosure of any of the allegedly privileged communications at issue would pose a risk to future attorney-client communications within the Department.

The Court does not mean to suggest that the Department is incorrect and that disclosure of the assertedly privileged records would do no harm to future attorney-client communications. The Department is certainly correct that confidentiality fosters—and is often necessary—to encourage a full and frank exchange of views between attorneys (including government attorneys) and clients (including agencies). The problem is simply that the Department has attempted too much with too little. It cannot address all attorney-client communications, by identifying "just . . . a few topics," by referring generally to "various [agency] employees," and by merely invoking a concern that "routine" disclosure would hinder future attorney-client communications. *See Jud. Watch, Inc.*, 2019 WL 4644029, at *4 (rejecting the following articulation of foreseeable harm: "Disclosure of the e-mails and attachments at issue would severely hamper the efficient day-to-day workings of the Department as individuals would no longer feel free to discuss their ideas, strategies, and advice in e-mail messages, and Department employees would be much more circumspect in their discussions with each other and with other Executive Branch officials. This lack of candor would seriously impair the Department's ability to foster the forthright internal discussions necessary for efficient and proper decision-making. Certainly, disclosure of such preliminary assessments and opinions would make officials contributing to pre-decisional deliberations much more cautious in providing their views.

Agency decision-making is at its best when employees are able to focus on the substance of their views and not on whether their views may at some point be made publicly available.").

For these reasons, the Court concludes that the Department has failed to satisfy its foreseeable-harm burden with respect to the attorney-client privilege withholdings relevant to Bates Nos. 505–23, 2985–3020, 581–86, 593, 621, 643 and Doc. No. 116. The Court will, however, give the Department one more—and only one more—opportunity to address this omission. *See Shteynlyuger v. Ctrs for Medicare & Medicaid Servs.*, 698 F. 3d 82, 132 (D.D.C. 2023) (noting that "the purposes of FOIA are ill-served by permitting an agency to wait for an opposing party or court to point out all the deficiencies in the agency's justifications for withholding records and then simply to file a renewed motion with the benefit of the court's detailed analysis of what is required to satisfy the agency's burden").

## D.    Segregability

Because the Department has sustained its burden with respect to certain challenged deliberative process privilege withholdings, the Court considers whether the Department has conducted the required segregability analysis. "[A]ccording to 5 U.S.C. § 552(b), FOIA's disclosure requirements are subject to specified exemptions, provided that '[a]ny reasonably segregable portion of a record shall be provided' after exempt portions are deleted." *Sussman*, 494 F.3d at 1112 (quoting 5 U.S.C. § 552(b)(1)(9)). Therefore, "[b]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." *Id.* at 1116 (citations omitted).

Here, the Department maintains that it "[c]onducted a line-by-line review of each page" and "considered whether factual information could be segregated from information subject to the deliberative process privilege and the attorney[-]client privilege." Dkt. 30-3 at 15 (Bickerstaffe

Decl. ¶ 14).  The statement, made under the penalty of perjury, supports "a presumption that [the agency] complied with [its] obligation to disclose reasonably segregable material," which can be overcome only with some "quantum of evidence" presented by the requester.  *Sussman*, 494 F.3d at 1117.  Here, Plaintiffs offer no reason to believe—and no evidence—that the Department failed in its segregability obligations.  To the contrary, a review of the unredacted portions of the records that were released confirms that the Department has endeavored to release any segregable, non-exempt material.  The Court, accordingly, concludes that the Department has satisfied its obligation to release that material.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, Dkt. 30, is hereby **GRANTED** in part and **DENIED** in part.  Specifically, Defendant's motion is granted with respect to the deliberative process withholdings on Bates Nos. 2644–86, 578–86, 593–98, 613–16, 621–55, discussing responses to press inquiries, Bates Nos. 331–36, 1266, 2440, 2586–91, 2071–77, 3703, 3739, discussing responses to non-profit organizations, Bates Nos. 2252–66, 2275, 3730–31, containing so-called "secret law," and Bates Nos. 3268–73, containing employee "reactions" to OFCCP policy.  It is additionally granted with respect to the deliberative process privilege withholdings in Categories A, C, E, G, J, K, P, Q, and V.

Plaintiffs' motion for summary judgment, Dkt. 31, is **GRANTED** as to Bates Nos. 4024–26, discussing responses to press inquiries, but is otherwise **DENIED** without prejudice.  The Court will direct the Department to submit a revised *Vaughn* index and, if necessary or helpful, additional declarations that address the deficiencies identified in this opinion.  *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 45 F.4th 963, 979 (D.C. Cir. 2022) (explaining that in "a case in which an agency presents a viable legal theory for a claimed

exemption but provides declarations that come up short in tying the requested records to that exemption, . . . it may be prudent for a district court to permit supplemental declarations"). The Court will determine the applicability of Exemption 5 to those documents, and whether DOL has fulfilled its duty to provide all factual information that is reasonably segregable, when the parties have submitted renewed motions.

      **SO ORDERED**.


                    /s/ Randolph D. Moss
                    RANDOLPH D. MOSS
                    United States District Judge


Date: November 4, 2024